**BLGH HOLDINGS LLC, Plaintiff Below, Appellant,**

v.

**ENXCO LFG HOLDING, LLC, Defendant Below, Appellee.**

**No. 531, 2011.**

Supreme Court of Delaware.

Submitted: Feb. 29, 2012.
Decided: March 27, 2012.

---

Stephen B. Brauerman and Vanessa R. Tiradentes, Esquires, of Bayard, P.A., Wilmington, Delaware; of Counsel: Geoffrey J. Greeves (argued) and Daron T. Carreiro, Esquires, of Pillsbury Winthrop Shaw Pittman LLP, Washington, D.C.; for Appellant.

Frederick L. Cottrell, III, Anne Shea Gaza and Jason J. Rawnsley, Esquires, of Richards, Layton & Finger, P.A., Wilmington, Delaware; Of Counsel: Joel A. Mullin, Esquire (argued), of Stoel Rives LLP, Portland, Oregon; for Appellee.

Before HOLLAND, JACOBS and RIDGELY, Justices.

JACOBS, Justice:

In 2010, BLGH Holdings LLC, the plaintiff-below ("BLGH"), entered into an agreement with enXco LFG Holding, LLC, the defendant-below ("enXco"), to sell BLGH's renewable energy business—Beacon Landfill Gas Holdings, LLC ("Beacon")—to enXco. The Unit Purchase Agreement that governed the sale of Beacon (the "UPA") called for a purchase price of $12 million, plus a "bonus payment" to BLGH if certain conditions were met. The sale of Beacon took place and BLGH was paid $12 million. A dispute arose, however, over whether BLGH was also entitled to the additional bonus payment. enXco claimed that no bonus payment was legally due. BLGH responded by filing a Superior Court action against enXco for breach of contract. Holding that no bonus payment was owed to BLGH under the UPA, the Superior Court granted summary judgment to enXco. BLGH appealed from that adverse ruling and

judgment, and for the reasons next discussed we reverse.

### FACTUAL AND PROCEDURAL BACKGROUND

BLGH is currently a "shell" holding company based in Arlington, Virginia with no full-time employees, office space, or assets other than certain monies claimed to be owed to it by enXco. The appellee, enXco, is an energy company based in San Diego, California. BLGH and enXco are both LLCs organized under Delaware law.

The parties began negotiating enXco's purchase of Beacon in early 2010. At that time, Beacon was operating under a contractual arrangement to sell its entire biomethane gas production to Conectiv Energy Supply, Inc. ("Conectiv"). Although the Conectiv agreement was set to expire in 2015, by 2010 BLGH viewed that contract as financially unfavorable to Beacon. Accordingly, and as a "condition precedent" to its purchasing Beacon, enXco insisted that BLGH cause Beacon to enter into a letter of intent with Shell Energy North America, L.P. ("Shell"), whereby Shell would replace Conectiv as the purchaser of Beacon's gas production. Beacon and Shell entered into that letter of intent (the "Shell letter of intent") on June 14, 2010. The UPA, which documented the terms of BLGH's sale of Beacon to enXco, was executed the following day.

As earlier noted, the UPA called for enXco to pay BLGH $12 million for Beacon, plus a "bonus payment" that would be owed if certain conditions were met.[1] Under Section 1.7 of the UPA, for BLGH to be entitled to that bonus payment two conditions would have to be satisfied—first, the Conectiv agreement must be terminated; and second, the "transaction outlined in Section 6.1(f) [of the UPA must be] consummated"—both by December 15, 2010.

Unquestionably the first condition was satisfied. What is disputed is whether the second condition was fulfilled. Regarding that question, all parties agree that a "transaction" (between enXco and Shell) was "consummated" before December 15, 2010. The only issue is whether that transaction was "[as] outlined in Section 6.1(f) [of the UPA]." That issue requires us to construe the UPA.

What complicates any analysis of that issue is that Section 6.1(f) of the UPA does not "outline" any transaction. That Section merely refers to a "letter of intent attached hereto [i.e., to the UPA] as *Exhibit E*,"[2] which is a copy of the June 14, 2010 letter of intent between Beacon and Shell. Exhibit E, in turn, incorporates by reference its own "Exhibit A," which is a document that is titled (and contains) "Indicative Terms for [the] Proposed Transaction."[3]

---

1. Section 1.7 of the UPA provides that the bonus payment will be calculated by subtracting from $6 million: (i) the amount of any payment made by enXco to terminate the Conectiv contract (here, $4.75 million) plus (ii) enXco's reasonable transaction costs associated with terminating the Conectiv arrangement and documenting the agreement between enXco and Shell that would replace the Conectiv agreement. In its brief, enXco states that those transaction costs were $108,165. BLGH did not respond to that figure in its reply brief, however. As a result,

the record is unclear as to whether the amount of the transaction costs is conceded or contested. Because we have determined that the case should be remanded, we express no view on that issue, which will be for the trial court to address in the first instance.

2. Italics in original.

3. In this Opinion, Exhibit "A" is sometimes referred to as the "indicative term sheet."

Four terms in Exhibit E are relevant to this dispute: (i) the duration of the agreement with Shell would be 15 years; (ii) to purchase Beacon's gas production, Shell would pay enXco a specified fixed price ($9.00/MMBtu), that would increase by 2% annually in the last five years of the contract; and (iii) enXco would have "flexibility" in setting its volume production obligations. Moreover, (iv) the letter of intent (Exhibit E) conditions the "consummation of the Proposed Transaction" on the "good faith negotiation ... of a definitive agreement ... containing such terms and conditions as set forth on *Exhibit A (as such terms may be modified, deleted or added to in each parties' sole discretion),*" by July 31, 2010.[4]

On June 16, 2010, BLGH entered into an agreement with Conectiv, entitling Beacon to terminate its contract with Conectiv for a one-time payment of $4.75 million. enXco's purchase of Beacon from BLGH closed the following day. Later, the deadline for executing the Shell transaction was extended beyond July 31, 2010, to afford more time for Shell and enXco to reach their separate agreement. That latter agreement was reached and finalized on August 9, 2010, and called for Shell to replace Conectiv as the exclusive purchaser of Beacon's renewable biomethane gas production. Thereafter, Beacon's "offtake" contract with Conectiv was terminated, and Conectiv was paid a $4.75 million termination fee.

After Shell and enXco entered into their final agreement, BLGH formally demanded that enXco pay the $1.25 million bonus payment that BLGH claimed was due.[5] By letter dated September 21, 2010, enXco responded that it would not pay the bonus, because the terms then contemplated for a final Shell contract were materially different from (and from enXco's perspective, less favorable than) the terms indicated in the Shell letter of intent (Exhibit E to the UPA).

In support of its position, enXco relied upon three differences between the terms of the final enXco-Shell agreement and the terms indicated in the Shell letter of intent. Specifically, the final agreement with Shell was for a term of 10 years, not 15. Moreover, the fixed purchase price for the Beacon gas production started at $8.91/MMBtu, not $9.00/MMBtu, and did not include guaranteed price increases. And lastly, enXco agreed to a fixed 8,000 MMBtu/day "capacity" purchase commitment and "inflexible monthly delivery requirement," in lieu of obtaining "substantial flexibility in setting the Minimum Daily Volumes," as described in the Shell letter of intent.

On October 13, 2010, BLGH filed this contract action, seeking damages of at least $1.25 million. On August 18, 2011, after a hearing on cross motions for summary judgment, the Superior Court held, in a bench ruling, that BLGH was not entitled to any bonus payment. The court stated that "there had to have been some room for negotiation and modification" of the indicative terms, but ruled that "the final transaction ... falls sufficiently short of the indicative terms ... [such that] it's not reasonable to believe that the final deal justified or triggered the bonus clause in the UPA 1.7." The court further held that although "enXco, in the end, thought that the deal was good enough to go through with ... there is still room, as a matter of law, under this contract to say that BLGH

---

4. Italics added.

5. $1.25 million represents the difference between the $4.75 million termination fee paid to Conectiv and $6 million provided for in Section 1.7 of the UPA.

is not entitled to the additional bonus payment."

This appeal followed.

### ANALYSIS

 BLGH claims that the Superior Court erred by imposing a requirement—nowhere contained in the UPA—that for BLGH to be entitled to a bonus payment under Section 1.7 of the UPA, the terms of any final transaction between enXco and Shell must be "substantially along the lines" of, or "materially similar to," the terms indicated in the Shell letter of intent.[6] Because that claim of error requires us to interpret the UPA and raises an issue of law, this Court reviews the trial court's interpretation of contract terms *de novo*.[7] Where, as here, the plain language of a contract is unambiguous *i.e.*, fairly or reasonably susceptible to only one interpretation, we construe the contract in accordance with that plain meaning and will not resort to extrinsic evidence to determine the parties' intentions.[8]

Expressed in its broadest form, the dispute concerns whether the final enXco-Shell agreement entitled BLGH to the bonus payment called for by the UPA. The critical requirement, which is set forth in Section 1.7 of the UPA, is that the ultimate contract between Shell and enXco must be "the transaction outlined in Section 6.1(f)" of the UPA. Thus, the initial question becomes: precisely what transaction is "outlined" in Section 6.1(f)?

enXco's position—which prevailed in the Superior Court—is that the final enXco-Shell agreement was not "the transaction outlined," as Section 1.7 required, because the ultimate transaction terms differed materially from those indicated in the Shell letter of intent. In response, BLGH contends that although changes were made to the indicative terms, those changes, whether material or not, are without legal import; that is, they do not relieve enXco of its contractual obligation to pay the bonus. The reason, BLGH urges, is that the Shell letter of intent, by its own express language, contemplated that the terms of the final Shell-enXco agreement might differ from those indicated in the Shell letter of intent. Those contentions enable us to frame the legal issue more precisely: did Section 1.7 (or some other provision) of the UPA condition BLGH's entitlement to a bonus payment upon there being no material or substantial difference between the terms of the final enXco-Shell agreement and the terms indicated in the Shell letter of intent?

enXco argues that that condition is implicit in the UPA. As support, enXco relies

---

**6.** The Superior Court did not expressly impose that requirement in that portion of the transcript where the court's ruling appears. It is inferable from the record, however, that in fact the court applied that legal standard in arriving at its result. During oral argument, the court repeatedly described enXco's claim to be that the UPA required "substantial compliance" with the indicative terms, or (alternatively) that those terms be "substantially fulfilled" in the final agreement, or that "the final deal was [required to be] substantially along the lines of the proposed deal." enXco itself characterizes as the court's holding, that the UPA required the final enXco-Shell agreement to be on materially similar terms as those indicated in the Shell letter of intent.

BLGH similarly describes the Superior Court as having imposed a requirement of "substantial compliance" with the terms indicated in the Shell letter of intent. Because there is no substantive difference between the "material similarity" and "substantial compliance" formulations of the standard that was actually applied, we refer to those standards interchangeably in this Opinion.

**7.** *See, e.g., Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del.1992).

**8.** *Id.* at 1196.

on the requirement of Section 1.7, that the final transaction must be as "outlined" in the Shell letter of intent. enXco reads "outlined" to mean that the final agreement cannot deviate in any material or substantial way from the terms indicated in the Shell letter of intent. Any other reading, enXco argues, would render the term "outlined" "meaningless and illusory," and thereby contravene Delaware's well-settled principles of contract interpretation.[9]

■ enXco's position is fatally flawed for three reasons. First, nowhere in the UPA can any express requirement of "substantial" or "material" compliance be found. Second, the meaning that enXco ascribes to "outlined" burdens that term with far more precision than it can reasonably bear when read in context. Even were we to accept as reasonable enXco's definition of "outlined," enXco's position still rests on an inaccurate premise—that Section 1.7 refers to a transaction "outlined" in the *Shell letter of intent* (Exhibit E of the UPA).[10] In fact, Section 1.7 refers to a transaction outlined in *Section 6.1(f)* of the UPA. Section 6.1(f), however, does not "outline" any transaction terms. All Section 6.1(f) requires is that the Shell letter of intent remain in force—which at all relevant times it did. Thus, Section

1.7's reference to a transaction "outlined" in Section 6.1(f), when fairly read, means a transaction "defined by," or "referenced in," Section 6.1(f).

Stated differently, neither Section 1.7 nor Section 6.1(f) of the UPA articulates any explicit text that prescribes what specific terms the final enXco-Shell agreement must contain to trigger BLGH's right to a bonus payment. If any such requirement exists, it must be found in the Shell letter of intent (Exhibit E), which is incorporated by reference into the UPA, and is the only potential source of any legally binding description or "outline" of the "transaction" referred to in Section 1.7 of the UPA.[11]

That brings us to the third fatal flaw in enXco's position: the Shell letter of intent, by its own terms, defeats enXco's argument. That document expressly conditioned the "consummation of the Proposed Transaction" on the negotiation of a final agreement containing the indicative terms "set forth on *Exhibit A ... as those terms may be modified, deleted or added to in each parties' sole discretion.*"[12] That language permits only one reasonable construction—that for BLGH to become entitled to a bonus, neither rigid (nor even substantial) adherence to the transaction terms indicated in the Shell letter of intent

---

9. Both parties rely upon *Estate of Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del.2010), for the principle that courts should not interpret a contract so as to render any of its language "meaningless or illusory."

10. In its brief, enXco states " 'The transaction outlined in Section 6.1(f)' *refers to the Beacon–Shell transaction outlined in the LOI* [letter of intent], which is directly mentioned in Section 6.1(f) and attached to the UPA as Exhibit E." (emphasis added). BLGH strongly disputes that characterization, arguing in its reply brief that "Section 1.7 does *not* reference the Shell LOI [letter of intent] nor any of the terms or conditions contained therein." (emphasis in original).

11. *Royal Indem. Co. v. Alexander Indus., Inc.,* 211 A.2d 919, 920 (Del.1965) ("Moreover, [appellant] concedes that the bond and the contract between the owner and the contractor *must be read together* in order to ascertain the intent of the parties, the *contract being expressly incorporated by reference in the bond.*") (italics added); *State ex rel. Hirst v. Black,* 83 A.2d 678, 681 (Del.Super.1951) ("It is, of course, axiomatic that a contract may incorporate by reference provisions contained in some other instrument.").

12. Italics added.

**416**

was required. To the contrary, the UPA contemplated that the negotiated terms of the final agreement might differ materially from the indicative terms, without violating the Shell letter of intent. To validate enXco's characterization of Section 1.7 of the UPA as requiring that the final contract terms be materially or substantially identical to those indicated in the Shell letter of intent, we would have to disregard the letter of intent's express authorization for modifications of, deletions from or additions to, those indicative terms. That approach would violate the cardinal rule of construction requiring a court to give effect to all contract terms, where possible.[13]

It may well be that the final terms of the Shell–Beacon contract were less favorable to enXco than those indicated in the Shell letter of intent. Even so, the transaction "outlined" in that letter of intent still met the requirements of Section 1.7 of the UPA: the Shell letter of intent was never terminated or abandoned as different terms were negotiated, and an agreement between enXco and Shell (albeit on modified terms) was ultimately reached. Nothing more was required by the UPA for BLGH to become legally entitled to the bonus payment. Accordingly, the Superior Court erred as a matter of law in granting summary judgment to enXco.

### CONCLUSION

For the above reasons, the judgment of the Superior Court is reversed, and the case is remanded for further proceedings consistent with this Opinion. Jurisdiction is not retained.

---

13. *E.I. du Pont de Nemours and Co., Inc. v. Shell Oil Co.,* 498 A.2d 1108, 1113 (Del.1985) ("[A] court must construe the agreement as a whole, giving effect to all provisions therein.") (citations omitted).