# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-17-00483-CV

**Integrity Global Security, LLC, and Green Hills Software, Inc., Appellants**

**v.**

**Dell Marketing L.P., Dell Federal Systems, L.P., and Dell Products, L.P., Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
### NO. D-1-GN-16-000345, HONORABLE JAN SOIFER, JUDGE PRESIDING

## O P I N I O N

Appellants Integrity Global Security, LLC, and Green Hills Software, Inc., (collectively, "IGS")[1] sued appellees Dell Marketing L.P., Dell Federal Systems, L.P., and Dell Products, L.P., (collectively, "Dell") for breach of contract. Dell answered, asserting several affirmative defenses and an alternative counterclaim for fraudulent inducement. Dell moved for summary judgment, and the trial court granted the motion, dismissing IGS's claims against Dell. On appeal, IGS argues that the trial court erred in granting Dell's motion for summary judgment, in refusing to rule on IGS's objections to Dell's summary judgment evidence, in refusing to grant IGS's

---

[1] We refer to appellants collectively as IGS for ease of discussion. However, there are several related entities involved in this case—Integrity Global Security, LLC, Green Hills Software, Inc., appellants and plaintiffs below, and Integrity Global Security Systems, LLC, formed in 2008 as a subsidiary of Green Hills Software to develop and sell Security software based on Green Hills' technology. We will specify the individual entity only if necessary for clarity.

motion to amend its original petition, and in refusing to grant IGS's motion for new trial. We will affirm in part and reverse in part the trial court's granting of summary judgment.

**Factual and Procedural Background**

IGS makes software for the storage and use of classified or otherwise sensitive information—such software systems are called multi-level security solutions, or MLS solutions. IGS developed and sold security solutions based on a "Real Time Operating System" that was certified in 2008 for the highest level of security classification by the National Security Agency.

In 2008 and 2009, Dell and IGS discussed developing and selling a MLS solution that integrated IGS's technology with Dell's computers—the Dell/Integrity Secure Consolidated Client. The parties sought to develop two versions of the software platform—one for general-purpose commercial and governmental computing ("Integrity PC") and one that would be certified at "PL4 or . . . Top Secret level"[2] and that would be marketed to governmental entities that had to store, use, and communicate classified information ("Integrity CSE"). When referring to the two versions of the software platform collectively, we will follow the parties' lead and use "Integrity Enterprise."

In May 2009, Dell and IGS signed a three-year contract under which they agreed to work together to develop and market Integrity Enterprise to "governmental and general purpose enterprise computing." IGS agreed to pursue Top Secret certification under a timetable set out in the agreement, while Dell agreed to provide IGS access to Dell's source code "so that IGS can work

---

[2] "PL4" is "Protection Level 4" security certification. PL certification goes from PL1 to PL5, with PL5 being the highest level, and the level of certification required by a governmental entity varies depending on the sensitivity of the information the entity has to store and use. Under the contract, "Top Secret" is defined as a security level of PL4 or higher.

toward achieving desired certifications." Dell obtained "Top Secret Exclusivity," which was defined as the exclusive, non-transferrable right to sell Integrity CSE to any "Top Secret Accounts" in the United States or to "the United States Government Top Secret Accounts worldwide." In exchange for Top Secret Exclusivity, Dell agreed to pay IGS a "minimum license commitment" ("MLC") of $66 million over the three-year term, made in quarterly payments ("MLC payments").[3] In September 2009, IGS learned that the relevant BIOS[4] was programmed and/or maintained in China and that Dell could not provide the source code. Because of those circumstances, Integrity CSE was ineligible for PL5 certification, and the parties instead decided to seek PL4 certification.

In June 2010, the parties terminated the original agreement and entered into an Amended and Restated Global Alliance Agreement ("the Agreement"). The Agreement provided that Dell would pay a slightly higher MLC—$66,230,000 total—in exchange for Top Secret Exclusivity. Dell could terminate for "convenience and without cause" with thirty days' notice on January 28, 2011, or with ninety days' notice thereafter, and IGS was allowed to terminate Dell's Top Secret Exclusivity if Dell had not sold a certain number of Integrity CSE licenses by certain dates. The Agreement provided that if a "termination event" by Dell or IGS occurred, "Dell's MLC shall terminate" and Dell would pay a prorated MLC payment for any "partial quarter shortened due to the termination." The Agreement further stated that if Integrity CSE "loses its Top Secret

---

[3] MLC is defined as "the minimum dollar value of" the license and maintenance fees Dell would pay IGS during the term of the contract. Dell had the discretion to determine "[t]he mix of Integrity PC and Integrity CSE licenses pre-purchased by Dell through payment of the MLC."

[4] BIOS stands for basic input/output system, which essentially is a computer's software framework on which other software programs run.

certification, accrual of the MLC ceases on the effective date of decertification and commences again upon recertification, unless otherwise terminated in accordance with this Agreement."

The parties sought to have Integrity CSE Top Secret certified, but had to obtain a new governmental sponsor when the original sponsor—the Air Force Research Laboratory—decided it did not need PL4. As a result, the Integrity CSE was not certified as PL4 in or by August 2010, as contemplated by the parties. A new governmental sponsor—the National Air and Space Intelligence Command—was identified in November 2010, and that sponsor added certain requirements for Integrity CSE and the computers on which it would be installed.

In January 2011, the parties signed Amendment Three to the Agreement ("the Amendment"). The Amendment provided a three-quarter long "On-Hold Time Frame" from February 1, 2011, through October 28, 2011. During the On-Hold Time Frame, Dell had "no right to terminate the Agreement," but it could terminate the Agreement "for convenience and without cause, upon not less than thirty (30) days prior written notice to IGS on November 30, 2011," or with ninety days notice thereafter. Dell's quarterly MLC payments during the On-Hold Time Frame were reduced from $3.75 million to $1.75 million, and Dell agreed to pay those quarterly MLC installments within thirty days "after the date of delivery of the deliverables" set out in the Amendment, most of which involved the provision of Integrity CSE "C&A materials"[5] or documentation. The Amendment further provided that because the quarterly payments were each $2 million less than the payments originally anticipated under the Agreement, "[n]o later than twelve

---

[5] "C&A" is "[c]ertification and accreditation at PL4 or at the Top Secret level or above if/when such certification is granted by the United States Government."

(12) months after the On-Hold Time Frame expires or is terminated, Dell, shall pay to IGS the difference between the MLC payments for each Period during the On-Hold Time Frame . . . and the MLC payments actually made by Dell to IGS during the On-Hold Time Frame."

In mid-August 2011, Dell emailed IGS notice that it would be "suspending MLC payments until we obtain PL4 certification" and that it would continue with its sales efforts based on the "PL3 that we've just obtained." In its notice, Dell expressed concerns that Integrity CSE would not achieve Top Secret certification and that Dell would therefore be unable to sell it to Top Secret Accounts, "which effectively nullifies the Top Secret Exclusivity." Dell referenced the Agreement's provision that stated that MLC would cease to accrue if Integrity CSE loses Top Secret certification, stating that "this clause, and Dell's obligation to pay the MLC, presupposes that Integrity CSE actually obtained a Top Secret certification. Again, the principal basis for the MLC payments is Top Secret exclusivity, and if the Integrity CSE is not Top Secret certified, the purpose of the Agreement is commercially frustrated and fails for lack of consideration." Dell explained that it would discontinue its MLC payments until Integrity CSE attained Top Secret certification, at which time it would recommence its payments.

IGS responded, disagreeing that Dell could suspend its payment obligations and noting that Dell had agreed to the On-Hold Time Frame, during which Dell's sales obligations were suspended and its MLC payments were reduced. IGS stated that it had met its deliverable requirements as set out in the Amendment and that the Amendment required Dell to make its MLC payments within thirty days of IGS satisfying its deliverable requirements. IGS also asserted that none of the MLC payments "are conditional on the achievement of top secret certification." IGS

5

stated that it wanted to continue working with Dell on Integrity Enterprise and expressed confidence that "this misunderstanding will be cleared up before the next payment is due."

On October 28, 2011, Dell sent IGS notice that it was terminating the Agreement without cause effective November 20, 2011. In August 2015, IGS sued Dell in federal court, but that suit was dismissed for lack of diversity of citizenship in December 2015. *See* 28 U.S.C. § 1332. In January 2016, IGS filed the underlying suit in Travis County, asserting that Dell had breached the contract in failing to make three specific MLC payments—$1.75 million due under the third amendment on October 28, 2011, $1.25 million due November 30, 2011,[6] and $6 million due October 28, 2012. It further claimed that Dell had breached the contract by terminating it in October 2011 and by telling would-be customers that Integrity Enterprise was not commercially viable. IGS alleged damages "in an amount believed to exceed $9,000,000."

Dell filed a traditional motion for summary judgment asserting: that IGS's claim for breach of contract failed because Dell terminated the contract effective October 28, 2011, relieving it of the obligation to make the $6 million MLC payment due under the Amendment on October 28, 2012; that IGS could not seek any other damages beyond those three MLC payments because it had conceded in discovery that the only damages it sought were those three payments; that the Delaware three-year statute of limitations on claims for breach of contract applied to bar IGS's claims; and that Delaware law barred IGS's claim for attorney's fees.[7] In its summary judgment response, IGS

---

[6] IGS sought the $1.25 million for November 2011, "assuming, *arguendo*, that the [Agreement] was terminated as of October 28, 2011."

[7] Dell initially also argued that its MLC payment obligation was dependent on Integrity CSE obtaining Top Secret certification, which never happened, and thus Dell did not owe IGS the $1.75 million due October 28, 2011, or the $1.25 million due November 30, 2012. In its reply to IGS's

argued that Texas's four-year statute of limitations applied, not Delaware's; that Dell breached the contract by suspending its MLC payments and refusing to pay IGS; that Dell sought to rely on inadmissable parol evidence; and that IGS's claims against Dell did not accrue until thirty days after it sent Dell a demand letter in January 2012. The trial court held a hearing on Dell's motion on March 28, 2017.

About a month later, on April 26, IGS filed a motion for leave to file an amended petition, stating that in his deposition in mid-April, Frank Muehleman, former General Manager of Dell Federal, testified that he had terminated the Agreement in August 2011. IGS argued that if the Agreement had been terminated in August 2011, it "could not be terminated without cause at the end of November 2011." IGS asked for leave to amend its petition to allege that "Dell terminated the Agreement in early August 2011 for cause," in violation of and "contrary to the terms of" the Amendment, amounting to breach of contract or wrongful termination of the contract. On May 5, the trial court signed its order granting Dell's motion for summary judgment "on all grounds" without having ruled on IGS's motion for leave to amend. IGS filed a timely motion for new trial, in which it noted that its motion was still pending, as was its "Request for Ruling, or in the Alternative, Request for Hearing to Argue Pending Evidentiary Objections," which objected to Dell's summary judgment evidence. IGS asserted that Muehleman's deposition had provided newly discovered evidence of additional breaches of the Agreement and Amendment. The trial court did not rule on IGS's motion for new trial, which was overruled by operation of law, *see* Tex. R. Civ.

summary judgment response, however, Dell withdrew that argument, conceding "that IGS has likely created disputed issues of fact that foreclose Dell's argument that IGS's claims for the $1.75 and $1.25 million MLC payments fail as matter of law."

7

P. 329b(c), nor does it appear to have ruled on IGS's evidentiary objections or its motion for leave to amend.

IGS argues that the trial court erred in granting Dell's motion for summary judgment. It argues that there were genuine issues of material fact as to whether Dell properly suspended the $1.75 million and $1.25 million payments due in October and November 2011 and whether the $6 million payment due in October 2012 was a "new" MLC or a preexisting obligation that survived the termination of the Agreement. IGS further contends that Dell's arguments related to limitations are incorrect and could not be proper grounds for summary judgment and that the evidence raised questions about whether Dell terminated the contract in August 2011, rendering the October 28, 2011 termination letter a nullity, or was estopped from terminating the contract by its representations in August that it intended to continue working with IGS on the project. IGS also asserts that the trial court erred in refusing to rule on its objections to Dell's summary judgment evidence and on its motion for leave to amend its petition and in refusing to grant its motion for new trial.

**$6 Million MLC Payment**

We first consider the parties' arguments related to the $6 million payment. In reviewing a trial court's granting of summary judgment, we consider whether the movant showed that it was entitled to judgment as a matter of law, taking as true all evidence favorable to the non-movant and indulging reasonable inferences and resolving doubts in its favor. *Community Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 680 (Tex. 2017). The Agreement's choice-of-law provision requires us to apply the substantive law of Delaware in interpreting the

8

contract.[8]  *See Arkoma Basin Expl. Co. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 387 & n.17 (Tex. 2008); *HealthTronics, Inc. v. Lisa Laser USA, Inc.*, 382 S.W.3d 567, 576 (Tex. App.—Austin 2012, no pet.).

Dell asserted in its motion for summary judgment that when it terminated the contract in October 2011, effective November 30, 2011, its obligation to make further MLC payments, including the $6 million payment due in October 2012, also terminated.  IGS, on the other hand, insists that the $6 million MLC payment was "an existing obligation to pay the full MLC due" during the On-Hold Time Frame and not a "new" MLC that could be terminated along with the Agreement. IGS argues that Dell was required to pay MLC sums as set forth in Table 2 of the Agreement and that the Amendment did not alter that table but instead merely put the "date of payment for the $6 million earned during [the On-Hold Time Frame] . . . on hold for one year."  Because the $6 million was due under the Agreement, IGS contends, it survived Dell's termination of the Agreement.  Based on the plain language of the Agreement and Amendment, we cannot agree.

The Agreement provides that "[t]he validity, construction, scope and performance of the Agreement shall be governed by the laws of the State of Delaware, without giving effect to any choice of law rules that may require the application of the laws of another jurisdiction."  Under Delaware law, as in Texas, when "the plain language of a contract is unambiguous i.e., fairly or reasonably susceptible to only one interpretation, we construe the contract in accordance with that plain meaning and will not resort to extrinsic evidence to determine the parties' intentions." *BLGH*

---

[8]  The applicable limitations period in light of the Agreement's choice-of-law provision is discussed later in this opinion.

*Holdings LLC v. enXco LFG Holding, LLC*, 41 A.3d 410, 414 (Del. 2012). A contract is not ambiguous simply because the parties disagree on its interpretation but when its language can fairly or reasonably be given different interpretations or may have multiple meanings. *Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992). A contract is unambiguous if we can determine its meaning with only knowledge of the basic facts on which its meaning depends. *Id.* "The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Id.*

IGS argues that the Amendment did not change Table 2 of the Agreement, which it contends provided that IGS "earned" the $6 million during the On-Hold Time Frame in exchange for granting Dell Top Secret Exclusivity during that time. Because the deferred $6 million was "due under Table 2," IGS argues, that obligation survived Dell's termination of the contract.

The contract, when read as a whole, explicitly provides that Dell's MLC obligation was divided into payments through the term of the contract and that those payments would cease upon termination of the contract. Although Dell agreed to pay $6 million a year after the On-Hold Time Frame ended, the Agreement also provided that upon termination of the contract, "Dell's MLC shall terminate," and the Amendment explicitly included a date of possible termination. The parties thus appear to have contemplated that the contract might end before its intended three-year term, and the Amendment does not state that the deferred $6 million was owed regardless of contract termination. We construe the plain language of the contract to mean both that the $6 million MLC was deferred while the parties continued to work on the project and achieving Top Secret certification and that Dell's obligation to make that payment ended when it terminated the contract.

10

This construction follows from the four corners of the contract. *See BLGH Holdings*, 41 A.3d at 414. Based on the summary judgment evidence before the trial court at the time it signed its order, the court properly granted Dell summary judgment as to the $6 million MLC payment.[9]

---

[9] IGS also argues that it produced evidence that Dell wrongfully breached the contract in August 2011, pointing to deposition testimony by Frank Muehleman. Muehleman was asked about Dell's August 11 email stating that Dell was going to withhold its MLC payments and that if Integrity CSE was not Top Secret certified, that fact "effectively nullifies Top Secret Exclusivity." Muehleman was asked whether that letter released IGS from the Top Secret Exclusivity arrangements so that it could sell to other buyers, and he answered:

> Well, at this point we're terminating the contract. We don't have a PL4 solution, so, you know, the—at this point I think the contract is gone. Now, if . . . at this point IGS went and turned around to HP and said, Hey, we've got a PL4 product and we're ready to go, I would have been royally pissed off, right, because at this point they're telling me they—they aren't there and they're going to have trouble getting there and it's going to be a long period. So, . . . we're terminating at this point because of an inability to deliver a product that we could jointly sell; and if you're asking, well, does that mean they can go on and sell to someone—to someone else, the technical answer is yeah, but ethically they just told me they couldn't deliver the product.

IGS insists that Muehleman's testimony conflicted with Dell's assertions that it merely suspended its MLC payments until its October 28, 2011 termination letter; that Dell wrongfully terminated the contract in August, during the On-Hold Time Frame; and that Dell was estopped from terminating the Agreement in October. *See Wilson v. American Ins. Co.*, 209 A.2d 902, 903-04 (Del. 1965) (estoppel may arise if party's conduct leads another to change position to his detriment).

Even if it were proper to consider Muehleman's testimony in reviewing the granting of summary judgment related to an unambiguous contract, *see BLGH Holdings LLC v. enXco LFG Holding, LLC*, 41 A.3d 410, 414 (Del. 2012) (courts should not resort to extrinsic evidence to determine parties' intent related to unambiguous contract), asked whether the August 11 letter was a termination or suspension letter, Muehleman said that it was "probably" a suspension letter and that he was trying to stop paying for licenses. He also said that if the product obtained Top Secret certification, "I believe we were all in agreement that we would continue, but at this point we're saying you need—you know, this is now step-up time." Further, Muehleman's statements appear to be subjective statements of his opinion, not of Dell's official stance, particularly in the context of his other testimony. Muehleman's testimony does not establish that Dell attempted to terminate the contract in August or misled IGS into continuing under the contract while intending to terminate—it establishes that Dell had serious concerns about the viability of the project.

11

**$1.75 and $1.25 Million MLC Payments**

We next consider whether the trial court properly granted summary judgment as to the $1.75 million due October 28, 2011, and $1.25 million due November 30, 2011. Dell argues that IGS's claims related to those payments were brought too late and are barred by limitations.

1.              *Does Texas's or Delaware's Statute of Limitations Apply?*

The Agreement provides, "The validity, construction, scope and performance of the Agreement shall be governed by the laws of the State of Delaware, without giving effect to any choice of law rules that may require the application of the laws of another jurisdiction." The provision goes on to specify that if IGS is the first party to file suit, it was to sue "in the Texas State or Federal Court in Travis County," whereas a suit brought by Dell would be filed in "a California State Court in Santa Barbara County, California," or in a federal court in Los Angeles, if the suit included claims "with exclusive Federal jurisdiction."

IGS argues that we should follow the general rule related to choice-of-law provisions, under which we apply the chosen state's law to substantive questions and Texas law to procedural matters. *Arkoma Basin Expl. Co.*, 249 S.W.3d at 387 & n.17; *Lisa Laser*, 382 S.W.3d at 576. "[W]hat is a matter of substance and what is a matter of procedure is determined by the law of the forum state." *Brandon v. Ivie*, No. 12-17-00344-CV, 2018 WL 4212883, at *2 (Tex. App.—Tyler Aug. 22, 2018, no pet.) (mem. op.); *PennWell Corp. v. Ken Assocs., Inc.*, 123 S.W.3d 756, 764 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Procedural matters include standards of review, preservation of error, and admissibility of evidence. *Lisa Laser*, 382 S.W.3d at 576; *see Autonation Direct.com, Inc. v. Thomas A. Moorehead, Inc.*, 278 S.W.3d 470, 472 (Tex. App.—Houston [14th

12

Dist.] 2009, no pet.). Dell, on the other hand, argues that by choosing the language used in the choice-of-law provision, "the parties made clear that they intended for Delaware law to apply broadly to matters relating to their agreement and that any general choice of laws rules that may require the application of the laws of another jurisdiction should not be given effect." Therefore, it argues, Delaware's three-year statute of limitations should be applied, *see* Del. Code § 8106, making IGS's claims as to the October and November 2011 MLC payments brought too late.

In Texas, "[s]tatutes of limitations are procedural." *Baker Hughes, Inc. v. Keco R. & D., Inc.*, 12 S.W.3d 1, 4 (Tex. 1999). Delaware law similarly states that "choice-of-law provisions in contracts do not apply to statutes of limitations, unless a provision expressly includes it. If no provision expressly includes it, then the law of the forum applies because the statute of limitations is a procedural matter." *Pivotal Payments Direct Corp. v. Planet Payment, Inc.*, No. CVN15C02059EMDCCLD, 2015 WL 11120934, at *3 (Del. Super. Ct. Dec. 29, 2015); *see American Energy Techs., Inc. v. Colley & McCoy Co.*, No. CIV. A. 98-398 MMS, 1999 WL 301648, at *2 (D. Del. Apr. 15, 1999) ("Choice of law provisions in contracts are generally understood to incorporate only substantive law, not procedural law such as statutes of limitation."); *Lumb v. Cooper*, 266 A.2d 196, 198 (Del. Super. Ct. 1970) ("limitations questions are generally settled by the law of the forum").

The Agreement's choice-of-law provision does not expressly state that it is intended to require the application of Delaware law to issues such as statutes of limitations or other procedural matters, and we therefore apply Texas's four-year statute of limitations. *See* Tex. Civ. Prac. & Rem. Code § 16.004; *B.E. Capital Mgmt. Fund LP v. Fund.com Inc.*, 171 A.3d 140, 147 (Del. Ch. 2017)

13

(choice-of-law provision did not expressly state that parties intended to apply New York's statute of limitations, and court thus applied Delaware's statute of limitations).

2.        *When Did The Claims Accrue?*

We next consider when IGS's claims related to those two payments accrued. IGS asserts that under the terms of the Agreement, they accrued on February 8, 2012, while Dell insists that they accrued on October 28 and November 30, 2011. The party seeking summary judgment on limitations must prove that the nonmovant's cause of action accrued outside the applicable limitations period. *ExxonMobil Corp. v. Lazy R Ranch, LP*, 511 S.W.3d 538, 542 (Tex. 2017); *Burns v. Thomas*, 786 S.W.2d 266, 267 (Tex. 1990). It was therefore Dell's burden to establish as a matter of law when IGS's claims accrued.

"A cause of action generally accrues when facts come into existence that authorize a claimant to seek a judicial remedy." *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex. 2003); *see Gabriel v. Alhabbal*, 618 S.W.2d 894, 896 (Tex. App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.) ("A cause of action does not accrue until facts exist which authorize the claimant to seek relief in a court of competent jurisdiction from the person due to make reparation."). In general, a claim for breach of contract accrues when the contract is breached. *Stine v. Stewart*, 80 S.W.3d 586, 592 (Tex. 2002); *see E.P. Towne Ctr. Partners, L.P. v. Chopsticks, Inc.*, 242 S.W.3d 117, 123 (Tex. App.—El Paso 2007, no pet.) ("A party breaches a contract by failing to perform when that party's performance is due."); *TeleVentures, Inc. v. International Game Tech.*, 12 S.W.3d 900, 910 (Tex. App.—Austin 2000, pet. denied) ("if there was a breach, it occurred when and where IGT ceased its performance of the contract"); *see also Worrel v. Farmers Bank of State of Del.*, 430

14

A.2d 469, 472 (Del. 1981) (claim for breach of contract accrues when contract is broken, not when actual damages result or are discovered). "For breach of contracts requiring fixed, periodic payments, Texas law is clear that a separate cause of action arises for each missed payment." *F.D. Stella Prods. Co. v. Scott*, 875 S.W.2d 462, 465 (Tex. App.—Austin 1994, no writ); *see Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 68 (Tex. 2015); *Townewest Homeowners Ass'n, Inc. v. Warner Commc'n Inc.*, 826 S.W.2d 638, 640 (Tex. App.—Houston [14th Dist.] 1992, no writ). However, if a demand is an integral part of or a condition precedent to the right to sue on a claim for breach of contract, limitations generally do not begin to run until a demand is made unless it is waived or unreasonably delayed. *Wiman v. Tomaszewicz*, 877 S.W.2d 1, 5 (Tex. App.—Dallas 1994, no writ); *Gabriel*, 618 S.W.2d at 896.

Paragraph 8.2 of the Agreement states:

> 8.2    In the event the Parties are unable to resolve the Dispute within thirty days of notice of the Dispute to the other Party, the Parties shall be free to pursue all remedies available at law or in equity.

IGS asserts that under paragraph 8.2, its claims did not accrue until February 8, 2012, thirty days after it sent Dell a letter requesting mediation of the payment dispute. Dell, on the other hand, argues that the claims accrued on October 28 and November 30, 2011, the dates the payments were allegedly due, noting that paragraph 8.1 contemplates that limitations would run during the parties' attempts to avoid litigation.[10]

---

[10] Paragraph 8.1 provides:

> 8.1    Regarding disputes related to the Agreement, the Parties will attempt to resolve any claim, difference, dispute or controversy (whether in contract, tort or otherwise) against the other party . . . arising out of or relating to the Agreement . . . through face

15

This is not a case in which the contract makes demand—in the form of notice of a dispute—a condition precedent to filing suit. *See Cummins & Walker Oil Co. v. Smith*, 814 S.W.2d 884, 887 (Tex. App.—San Antonio 1991, no writ) ("[W]here the parties so frame their contract as to make prior demand an integral part of a cause of action or a condition precedent to a right to sue, the statute of limitations does not begin to run until demand is made. Limitations will run from the date of demand or refusal."). Instead, IGS's claims related to the $1.75 million and $1.25 million MLC payments accrued on their due dates. *See Hooks*, 457 S.W.3d at 68; *Scott*, 875 S.W.2d at 465.

3.        *Tolling Under Section 16.064(a)*

IGS next argues that if its claims accrued on October 28 and November 30, 2011, limitations were tolled under section 16.064(a) of the civil practice and remedies code. *See* Tex. Civ. Prac. Rem. Code § 16.064(a).[11] Dell contends that section 16.064(a) does not apply because IGS's federal filing was made with intentional disregard for the federal court's diversity jurisdiction.

_____

to face negotiation . . . or through mediation . . . rather than through litigation. . . . Notwithstanding the foregoing, either Party will have the right to obtain from a court of competent jurisdiction a temporary restraining order, preliminary injunction, or other equitable relief to prevent irreparable harm, avoid the expiration of any applicable limitations period, or preserve a superior position with respect to other creditors, although the merits of the underlying Dispute will be resolved in accordance with this paragraph.

[11] The period between the filing an action in a trial court and a second filing of the same action in a different court suspends the running of limitations during that period if the first action was, as applicable here, dismissed due to lack of jurisdiction and the second suit is filed within sixty days "in a court of proper jurisdiction." Tex. Civ. Prac. & Rem. Code § 16.064(a).

16

*See id*. § 16.064(b) ("This section does not apply if the adverse party has shown in abatement that the first filing was made with intentional disregard of proper jurisdiction.").

IGS filed its claim for breach of contract in federal court in August 2015, within four years of the alleged breaches. That suit was dismissed on December 14, 2015, and IGS filed the underlying suit within sixty days. In its motion for summary judgment, Dell argued that section 16.064(a) did not toll limitations because "IGS intentionally, or at the very least negligently, made its original filing in the wrong court," pointing as evidence of that intentional or negligent behavior to IGS's petition in the federal case and the federal court's order of dismissal.

In IGS's federal pleading, it stated that Integrity Global Security, LLC is "a Delaware limited liability company with its principal of business in Santa Barbara, California," and "wholly owned by Plaintiff Green Hills Software, Inc.," and that Green Hills Software, Inc. is "a Delaware corporation with its principal place of business in Santa Barbara, California." In its listing of the defendants, it alleged that Dell Marketing, L.P. "is a Texas limited partnership with its principal place of business in Round Rock, Texas," that Dell Federal Systems, L.P. "is a Texas limited partnership with its principal place of business in Round Rock, Texas, and that Dell Products, L.P. "is a Texas limited partnership with its principal place of business in Round Rock, Texas."

In the federal court's order of dismissal, the court noted that the citizenship of a limited partnership "is determined by the citizenship of all its members." The court stated that Dell had produced documents on file with the Texas Secretary of State showing that Dell Marketing's general partner "is Dell Marketing GP, LLC which is identified as a foreign company in the jurisdiction of Delaware," and that Dell Marketing GP, LLC "is identified as owned by Dell

17

Marketing Corp. which was formed in Delaware"; that Dell Federal's general partner "is Dell Federal Systems GP, LLC which is identified as a foreign company in the jurisdiction of Delaware," and that Dell Federal Systems GP, LLC "is identified as owned by Dell Federal Systems Corp. which was formed in Delaware"; and that Dell Product's general partner "is Dell Products GP, LLC which is identified as a foreign company in the jurisdiction of Delaware," and that Dell Products GP, LLC "is identified as owned by Dell Products Corp. which was formed in Delaware." The court explained that IGS's "focus on the state of formation of a partnership is misplaced" and disagreed with IGS's assertion that the citizenship of the various Dell entities was unclear because all of the entities have Texas addresses and list Texas residents as officers. It also disagreed with IGS that there were internal inconsistencies in Dell's filings with the Secretary of State, relying on a declaration by Christopher R. Stidvent, an attorney for Dell, who "confirms the ownership structure of Defendants." The court stated that IGS's challenges to the filed documents "ignore the evidence presented by Stidvent confirming the citizenship of Defendants." The court concluded that IGS had not carried its burden of distinctly and affirmatively alleging the parties' citizenship. *See Getty Oil Corp. v. Insurance Co. of N. Am.*, 841 F.2d 1254, 1259 (5th Cir. 1988).

In its motion for summary judgment, Dell referred to IGS's federal petition and the federal dismissal order and asserted that IGS "is charged with knowledge of the law," that its federal petition "establishe[d] that IGS failed to allege the citizenship of each" Dell entity, that the petition's listing of the IGS entities' ownership structure "demonstrat[ed] that IGS understood how to properly allege citizenship for an entity such as a limited liability company or a partnership," and that IGS "could easily have known the ownership structure of the Dell entities because that information was

18

publicly available on the Texas Secretary of State's website."  Thus, Dell contended, IGS

"intentionally or negligently" misfiled its original suit in federal court, and section 16.064 did not

toll limitations.

On appeal, Dell asserts that even if IGS was mistaken about how to allege the

citizenship of a limited partnership or made any other mistake of law, IGS is "charged with

knowledge of the law" and the lack of the necessary citizenship allegations in IGS's federal petition

"establishes IGS's disregard for proper jurisdiction."[12]  It also notes that the supreme court has held,

"Once an adverse party has moved for relief under the 'intentional disregard' provision, the

nonmovant must show that he did not intentionally disregard proper jurisdiction when filing the case.

---

[12]  Dell points to *Parker v. Cumming*, 216 S.W.3d 905 (Tex. App.—Eastland 2007, pet.
denied), and *French v. Gill*, 252 S.W.3d 748 (Tex. App.—Texarkana 2008, pet. denied), to support
its assertion that any mistake related to pleading citizenship in a federal petition is immaterial
because IGS was "charged with knowledge of the law."  The facts presented in this case, however,
are distinguishable from those in *Parker* and *French*.

In *Parker*, the petition filed in the first lawsuit plainly showed the jurisdictional issue at the
outset, and the plaintiff did not create a fact question as to an intentional disregard of jurisdiction,
despite the issue being pointed out by the defendants.  216 S.W.3d at 911.  In *French*, the plaintiffs
sued in federal court under diversity jurisdiction; added two non-diverse defendants; and when the
federal court disallowed the amended pleading, sued the non-diverse defendants in state court.
252 S.W.3d at 750.  Because the attempted amended petition stated outright that the new defendants
would defeat federal jurisdiction—indeed, the federal court denied leave to file the amended petition
because the additional defendants "were clearly added solely for the purposes of defeating diversity
jurisdiction"—the plaintiffs could not rely on section 16.064 because their attorney was charged with
knowledge of the law, there was no indication of any mistaken understandings of fact, and the
evidence instead showed that his filing was made in intentional disregard of the federal court's
jurisdiction.  *Id*. at 752, 756-57.

Here, by contrast, IGS's federal petition, although not fully pleading citizenship of the Dell
entities, does not on its face show a lack of diversity jurisdiction or other jurisdictional defect, nor
does the evidence contain indications that IGS knew diversity jurisdiction did not exist.

As it is the nonmovant who has this information, he should bear the burden of producing it." *In re United Servs. Auto. Ass'n*, 307 S.W.3d 299, 312 (Tex. 2010) (orig. proceeding).

A mistake of law may be a sufficient excuse under section 16.064, which "was drafted precisely because capable lawyers often make good faith mistakes about the jurisdiction of Texas courts," although it does not protect a plaintiff who misfiles as a part of a "strategic decision to seek relief" from a court that lacked jurisdiction.[13] *Id.* at 313 (cleaned up).

It is true, as Dell notes, that a party suing in federal court under diversity jurisdiction must distinctly and affirmatively allege the citizenship of the parties, which, for a limited partnership, is "that of all its partners, general and limited." *Mullins v. Testamerica Inc.*, 300 F. App'x 259, 259-60 (5th Cir. 2008). It is also true that IGS's federal petition contained incomplete allegations of citizenship. However, a mere mistake as to federal jurisdiction is not enough to satisfy

---

[13] In *In re United Services Automobile Associatio*n, the plaintiff filed his original suit in a county court at law, alleging that he sought damages in excess of the statutory minimum but omitting the required allegation that his damages were below the $100,000 statutory maximum. 307 S.W.3d 299, 305 (Tex. 2010) (orig. proceeding). USAA filed a plea to the jurisdiction noting that omission, and the plaintiff amended his petition to allege damages exceeding $1 million. *Id.* After a jury awarded the plaintiff more than $900,000, USAA appealed, and the supreme court reversed on grounds that the amount in controversy at the time the plaintiff filed suit exceeded the county court at law's jurisdiction. *Id.* The plaintiff then filed his suit in a district court, and USAA filed another plea to the jurisdiction, asserting the plaintiff could not rely on section 16.064(a) for limitations tolling because the original suit had been filed with intentional disregard for jurisdiction, and sought mandamus relief when the district court denied the plea. *Id.* The supreme court agreed, stating that the plaintiff could not rely on section 16.064 because the original suit "unquestionably sought damages in excess of" the county court's jurisdictional cap. *Id.* at 313. The supreme court noted that the original petition omitted the required allegation about maximum damages, that the plaintiff had never contended that he was unaware of or confused about the county court's jurisdictional limits, and that he instead made a "strategic decision to seek relief" from the county court. *Id.* In this case, by contrast, Dell did not unequivocally allege that IGS had intentionally disregarded the federal court's jurisdiction, nor does the record establish a strategic decision to file in the federal court in disregard of jurisdiction.

20

subsection (b).  *United Servs. Auto. Ass'n*, 307 S.W.3d at 313.  We note that in dismissing IGS's lawsuit, the federal court went into some depth in explaining issues related to the ownership of limited partnerships and discussed Dell's filings with the Secretary of State and the attorney's declaration about Dell's citizenship, but in seeking summary judgment, Dell did not provide copies of the Secretary of State filings and simply asserted that they were "publicly available on the Texas Secretary of State's website," nor did it attach the attorney's declaration.

Furthermore—and importantly—Dell alleged in its motion for summary judgment that IGS "intentionally *or negligently*" filed its suit in federal court.  (Emphasis added.)  However, whether IGS was negligent in its federal filing is not the correct standard—section 16.064 required Dell to "show[] in abatement that the first filing was made with *intentional disregard* of proper jurisdiction."  *See* Tex. Civ. Prac. & Rem. Code § 16.064 (emphasis added); *Chacon v. Andrews Distrib. Co.*, 295 S.W.3d 715, 722-23 (Tex. App.—Corpus Christi 2009, pet. denied).  To hold that Dell's allegations of intentional *or negligent* misfiling, coupled with the evidence discussed above, triggered a requirement that IGS prove its lack of intentional conduct would eliminate section 16.064(b)'s requirement that the party seeking to avoid tolling must "show[] in abatement" the intentional nature of the misfiling.  Dell's allegations thus did not fully invoke section 16.064(b).

The federal dismissal order and IGS's federal petition together do not show that IGS intentionally disregarded that court's jurisdiction in filing its suit, and Dell's assertion that IGS intentionally *or negligently* filed its federal suit did not shift to IGS the burden to produce evidence that it did not intentionally disregard the federal court's jurisdiction.  *See United Servs. Auto. Ass'n*, 307 S.W.3d at 312.  On this record, Dell did not show as a matter of law that limitations barred

21

IGS's claims for $1.75 million and $1.25 million. The trial court therefore erred in granting summary judgment as to those two claims on grounds of limitations.[14]

### IGS's Other Damages

Dell's motion for summary judgment asserted that two IGS witnesses testified that "there were no damages other than the $1.75, $1.25, and $6 million MLC payments" and noted that the Agreement included a limitation on liability providing that neither party would be liable "for any indirect, incidental, special, punitive or consequential damages of any type including, without limitation, lost projects and lost sales, arising out of or in connection with the agreement." The only portions of IGS's summary judgment response that can be read as responding to that argument are: (1) the statement in its "Summary of the IGS Opposition," "Whether IGS' damages are limited to the three payments as Dell argues depends on the disputed genuine issues of material fact asserted in IGS' opposition," citing to IGS's original petition; (2) a reference in its "Factual Background" portion to deposition testimony by Michael Liacko, a former Dell employee, that in January 2012, Dell contacted potential Integrity CSE customers to tell them that Dell was pulling out of its arrangement with IGS and to wait for a Dell solution, which "had the effect of killing IGS' business"; and (3) IGS's statement that its claims of breach of contract "are not limited, as Dell argues, to Dell's failure to make three payments," and that Dell's "de facto termination of IGS rights . . . ruined IGS independent efforts after November 30, 2011 to market and sell its security solution

---

[14] Because we have held that summary judgment was improper as to the October 28 and November 30, 2011 MLC payments, we need not address IGS's arguments related to whether Dell was estopped from withholding those payments by its earlier representations and its alleged wrongful termination of the contract in August 2011, before it sent its termination letter in October.

22

to Top Secret Accounts and killed its government security business," citing again to its original petition. IGS did not refer again to Liacko's testimony or attempt to explain how it was evidence of extra-contractual damages for which Dell might be liable. In its arguments, IGS pointed only to its own petition. *See, e.g.*, *Laidlaw Waste Sys. (Dall.), Inc. v. City of Wilmer*, 904 S.W.2d 656, 660-61 (Tex. 1995) (sworn pleadings that "set out in 'great detail' the essential facts" might be able to be used as proof in summary judgment proceeding); *Chamie v. Memorial Hermann Health Sys.*, 561 S.W.3d 253, 256 (Tex. App.—Houston [14th Dist.] 2018, no pet.) ("Pleadings generally are not proper summary judgment evidence. Chamie offers no explanation as to why this court should treat his pleadings as summary judgment evidence, and we discern no reason to do so; the pleadings simply contain Chamie's allegations in this case and are not evidence. Likewise, we cannot consider the attachments to Chamie's brief, as they are not a part of the appellate record." (citations omitted)). IGS thus did not counter Dell's evidence and show that it suffered damages beyond the disputed MLC payments.

Further, on appeal, the portions of IGS's briefing related to the damages it might have suffered outside of the MLC payments state in full:

> Liacko, in his deposition testimony explains how Dell, in January 2012, put a stake in the heart of IGS's security business.[15] This must be taken as true. This opens up damages issues which Dell does not attempt to address.
>
> IGS offered Mr. Liacko's deposition testimony and contemporaneous correspondence, including Dell communications to potential DISCC [Dell/Integrity

---

[15] IGS points to Liacko's testimony that in January 2012, a Dell employee "picked up the phone and called—which we knew because we spoke to the customers and they told us that, and he confirmed it. And his intent, from what we were told, was to try to create a case to prove that [Integrity CSE] was commercially not viable. That's what he was trying to do."

Secure Consolidated Client] customers, evidencing Dell's successful effort to prevent IGS from selling DISCC to the DISCC pipeline, resulting in damages exceeding $9,000,000. This evidence must be taken as true.

Further, if Muehleman's testimony is believed, Dell's termination of the Restated Agreement and Third Amendment breached the Third Amendment and precluded any right of Dell to terminate the Agreements for convenience and without cause.

Although IGS refers to Liacko's and Muehleman's deposition testimony, it does not explain how IGS suffered recoverable damages beyond the three disputed MLC payments. *See* Tex. R. App. P. 38.1(I); *Gunn v. McCoy*, 554 S.W.3d 645, 677 (Tex. 2018); *ETC Mktg., Ltd. v. Harris Cty. Appraisal Dist.*, 528 S.W.3d 70, 75-76 (Tex. 2017).

We conclude that the trial court did not err in granting of summary judgment related to any damages beyond the three disputed MLC payments.

## IGS's Pending Motions

IGS argues that the trial court abused its discretion in not granting its motion for leave to amend its petition[16] and its motion for new trial, both of which rely on what IGS described as "newly discovered evidence" in the form of deposition testimony by Frank Muehleman.[17] It further

---

[16] IGS filed its motion for leave to amend its petition after the hearing on Dell's motion for summary judgment but before the trial court signed its order granting summary judgment, pointing to Muehleman's deposition, which occurred in the interim. IGS sought to amend its petition to allege that Dell breached the contract in attempting to terminate the Agreement during the On-Hold Time Frame and that Dell violated the duty of good faith and fair dealing. IGS asserted that if Dell had terminated or attempted to terminate the contract in August 2011, that act was a breach of contract, that Dell's August representations to IGS that it wanted to continue working together were misrepresentations on which IGS relied, and that the October 2011 notice of termination was a nullity. IGS also contended that if Dell wrongfully breached the contract in August 2011, IGS was entitled to unspecified damages beyond the three MLC payments.

[17] A party seeking a new trial on grounds of newly-discovered evidence must show the trial court that it learned of the evidence since trial, its failure to discover the evidence sooner was not due

24

argues that the court abused its discretion in not ruling on IGS's pending motion objecting to Dell's summary judgment evidence, IGS's request for ruling on its evidentiary objections, and its motion to stay.[18] However, Dell withdrew its summary-judgment contention that it had shown as a matter of law that it was entitled to withhold MLC payments until the parties achieved PL4 certification, which was the argument to which much, if not all, of the disputed evidence was germane. Further, because we are reversing the granting of summary judgment as to two of the disputed MLC payments, IGS may reurge and seek rulings on those pending motions, if still relevant. We thus need not consider these arguments on appeal.

## Conclusion

The trial court erred in granting summary judgment as to IGS's claims for the $1.75 million and $1.25 million MLC payments. We therefore reverse and remand the trial court's order granting summary judgment as to those two payments. We affirm the remainder of the court's rulings on summary judgment.

---

to its lack of diligence, and the evidence is not cumulative and would probably produce a different result on retrial. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010).

[18] A trial court's decisions on the admissibility of evidence, a motion for leave to amend its petition, a motion for stay, and a motion for new trial are all reviewed for an abuse of discretion. *See Caffe Ribs., Inc. v. State*, 487 S.W.3d 137, 142 (Tex. 2016) (exclusion of evidence); *Waffle House*, 313 S.W.3d at 813 (motion for new trial); *Warner Bros. Entm't, Inc. v. Jones*, 538 S.W.3d 781, 817 (Tex. App.—Austin 2017, pet. filed) (admission of evidence); *Silverman v. Johnson*, 317 S.W.3d 846, 849 (Tex. App.—Austin 2010, no pet.) (motion to stay); *Perez v. Embree Constr. Grp., Inc.*, 228 S.W.3d 875, 882-83 (Tex. App.—Austin 2007, pet. denied) (amendment of pleadings).

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Kelly and Smith

Affirmed in Part; Reversed and Remanded in Part

Filed:   May 17, 2019