# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JEFFREY LLAMAS and STEVEN LLAMAS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 2018-0516-JTL |
| | ) | |
| STUART W. TITUS, JOHN W. HUEMOELLER and TIMOTHY R. SCOTT, | ) | |
| | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| STONE ASH, LLC f/k/a GENERAL HEMP, LLC, a Delaware limited liability company, and KETTNER INVESTMENTS, LLC, a Delaware limited liability company, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Nominal Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: April 15, 2019
Date Decided: June 18, 2019

Albert H. Manwaring, IV, Albert J. Carroll, Alberto E. Chávez, MORRIS JAMES LLP, Wilmington, Delaware; *Counsel for Plaintiffs.*

Kenneth J. Nachbar, R. Judson Scaggs, Jr., Lauren Neal Bennett, Thomas P. Will, Barnaby Grzaslewicz, Elizabeth A. Mullin, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Counsel for Defendants and Nominal Defendants.*

**LASTER, V.C.**

Before his death on November 5, 2017, Michael Llamas owned a 90% member interest in Stone Ash, LLC (the "Company"), and he served as one of its two managers. Defendant Stuart Titus owned the other 10% member interest and served as its other manager. When Michael died, his status as a member terminated, and the economic rights associated with his interest passed to his estate.[1] Michael's status as a manager likewise terminated. Titus was left as the sole member and sole manager of the Company.

The Company owned a large block of stock in Medical Marijuana, Inc., an Oregon corporation that is a development-stage, penny-stock issuer involved in cannabis-related businesses. Its shares trade over the counter under the symbol "MJNA," which this decision uses to refer to the issuer. Through his positions with the Company, Michael managed MJNA's operations, despite not having any formal position with that entity.

Michael's death left Titus in control of the Company and, through it, MJNA. Enter James Arabia, one of Michael's advisors. After learning of Michael's death, Arabia moved quickly to assert control over the Company. He did so by advising Titus to appoint defendants John Huemoeller and Timothy Scott as additional managers, explaining that they could support Titus and that Michael would have wanted it that way. Huemoeller and Scott are beholden to Arabia, and adding them would give Arabia control over the Company at the manager level. Moreover, under the terms of the Company's then-

---

[1] Multiple members of the Llamas family figure prominently in this decision. For clarity, the opinion uses first names to identify them.

operative LLC agreement (the "Original LLC Agreement"), Huemoeller and Scott could remove Titus as a manager, thereby consolidating Arabia's control.

Titus followed Arabia's advice. On November 7, 2017, two days after Michael's death, Titus executed a written consent that appointed Huemoeller and Scott as additional managers (the "November 7 Consent"). Only after signing the November 7 Consent did Titus become concerned about its implications. He reached out to Stephen Silverman, a lawyer who had represented the Company. After meeting with Silverman, Titus understood that he had handed over control to Arabia. He was shocked and dismayed, and he asked Silverman to fix the problem he had created.

Meanwhile, members of the Llamas family learned about Arabia's coup. A flurry of communications and meetings ensued. On November 13, 2017, Titus and Silverman met with the plaintiffs: Steven Llamas, Michael's father, and Jeffrey Llamas, Michael's brother. Titus executed a new LLC agreement for the Company (the "Amended LLC Agreement"). Among other things, it established a board of managers with a maximum of three members. In three locations, it described Titus as the sole member and manager of the Company. The description was inaccurate, because no one ever took action to remove Huemoeller or Scott.

During the same meeting, Titus executed a written consent that purported to appoint Titus, Steven, and Jeffrey as members of the board of managers (the "November 13 Consent"). But it did not first remove any of the incumbent managers.

Several days later, Titus told Arabia about the Amended LLC Agreement and the November 13 Consent. Arabia convinced Titus to return to the fold. On November 20, 2017, Titus executed another LLC agreement for the Company (the "Final LLC

2

Agreement"). On November 21, 2017, Titus executed a written consent that purported to remove Steven and Jeffrey and replace them with Huemoeller and Scott (the "November 21 Consent").

In this lawsuit, Steven and Jeffrey contend that they were properly appointed as managers but never properly removed. Although they do not dispute the effectiveness of the Final LLC Agreement, they contend that the November 21 Consent is invalid along with all of the actions that the board of managers subsequently took.

In response to this lawsuit, the defendants have raised an array of arguments and defenses, one of which is dispositive. Assuming for the purposes of analysis that Titus validly adopted the Amended LLC Agreement (which the defendants otherwise contest), the defendants correctly point out that Titus never removed the incumbent managers.

This post-trial decision holds that the November 13 Consent did not appoint Steven and Jeffrey to the board of managers. Once adopted, the Amended LLC Agreement limited the size of the board to three managers. With Titus, Huemoeller, and Scott occupying those seats, there were no vacancies to fill. The November 13 Consent therefore provides no basis to challenge any actions that the managers of the Company subsequently took. Since November 7, 2017, the Company's managers have been Titus, Huemoeller, and Scott.

## I.       FACTUAL BACKGROUND

During a one-day trial, the parties introduced 208 exhibits and lodged ten deposition transcripts. Seven fact witnesses testified live. The parties agreed to sixteen stipulations of

3

fact in the pre-trial order.[2]

All of the witnesses had some type of credibility issue, and many had several. The members of the Llamas family, the named defendants, and Arabia had personal interests in the outcome of the case and strong feelings about each other. Titus was a particularly unreliable witness who repeatedly changed his story and offered dubious interpretations of contemporaneous documents. Arabia, Huemoeller, and Scott were confident witnesses, but they had the air of confidence men. They seemed only to be telling part of the story. Steven and Jeffrey were generally credible, but they had the least first-hand knowledge about significant events, and Jeffrey had some unconvincing memory lapses. Silverman and Priscilla Vilchis, Michael's girlfriend when he died, testified by deposition. Their accounts were mixed: Some portions seemed credible, others exaggerated, and still others undermined by conspicuous failures of memory.

I have done my best to reconcile the conflicting accounts. Generally speaking, contemporaneous documents have received the most weight. The plaintiffs bore the burden of proving the facts necessary to support their claims by a preponderance of the evidence.[3]

_____

[2] Citations in the form "PTO ¶ —" refer to stipulated facts in the pre-trial order. Dkt. 116. Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations to testimony by members of the Llamas family use their first names. Citations in the form "JX — at —" refer to a trial exhibit with the page designated by the last three digits of the control or JX number. If a trial exhibit used paragraph numbers, then references are by paragraph.

[3] *See* 26 C.J.S. *Declaratory Judgments* § 157, Westlaw (database updated June 2019) ("The plaintiff normally has the burden of showing entitlement to declaratory relief by a preponderance of the evidence; although who must sustain the burden of proof in an

4

## A.    Michael and MJNA

By all accounts, Michael was a charismatic and energetic entrepreneur. By his mid-twenties, he had amassed a fortune in real estate as the co-founder of North American Companies, "a real estate development and acquisitions firm specializing in all areas of distressed debt."[4] But all was not done according to Hoyle. In September 2012, the United States Department of Justice indicted Michael for his alleged involvement in multistate mortgage fraud and Ponzi schemes.[5] In August 2016, Michael pled guilty to a subset of the charges, and he was awaiting sentencing when he died in November 2017.

Before his entanglements with the law, Michael's business interests expanded to cannabis-related products. In March 2011, at age twenty-six, he purchased a controlling interest in MJNA. The parties share an interest in depicting MJNA as a substantial enterprise deserving the positive associations that customarily accompany publicly traded

---

action for a declaratory judgment depends on the condition of the pleadings and the character of the issues at the time the question is presented."); *see also San Antonio Fire & Police Pension Fund v. Amylin Pharms., Inc.*, 983 A.2d 304, 316 n.38 (Del. Ch. 2009) ("Because Amylin seeks a declaratory judgment as to its right to approve, it bears the burden of proof here."); *Those Certain Underwriters at Lloyd's, London v. Nat'l Installment Ins. Servs., Inc.*, 2007 WL 4554453, at *6 (Del. Ch. Dec. 21, 2007) ("[T]he better view is that a plaintiff in a declaratory judgment action should always have the burden of going forward."), *aff'd*, 2008 WL 4918222 (Del. Nov. 18, 2008) (ORDER).

[4] Medical Marijuana, Inc., Q3 2012 Information and Disclosure Statement 21 (Nov. 27, 2012).

[5] Press Release, United States Attorney's Office for the Eastern District of California, Roseville Wealth Adviser Lee Loomis Arrested for Fraud Schemes (Sept. 14, 2012), https://archives.fbi.gov/archives/sacramento/press-releases/2012/roseville-wealth-adviser-lee-loomis-arrested-for-fraud-schemes.

status. MJNA's disclosures tell the more complicated story of a dubious penny-stock issuer with a long history of questionable transactions.[6]

According to its disclosures, MJNA began life in 2003 as Berkshire Collection, Inc., a Canadian corporation that traded under the symbol "BKRCF."[7] According to a complaint filed by the SEC in 2009, Berkshire Collection was one of fifty-nine subsidiaries spun off by Blackout Media Corporation and its principal, Sandy Winick, as part of a scheme to create publicly traded companies lacking any business purpose and manipulate their shares.[8] After pleading guilty in 2015, Winick was sentenced in 2016 to seventy-eight months in prison and ordered to pay $2,431,038.32 in restitution and $5 million in civil forfeiture.[9]

---

[6] Although MJNA does not make public filings with the SEC, such as Form 10-Qs or Form 10-Ks, it has followed a practice of filing (often late) what it describes as quarterly and annual reports. MJNA's disclosures are available at www.otcmarkets.com. As such, their contents are subject to judicial notice. *See, e.g.*, *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 585 (Del. Ch. 2007). This decision does not rely on the contents of the public filings to make any factual findings pertinent to the case, but only to provide context.

[7] Medical Marijuana, Inc., 2009 Information and Disclosure Statement 2 (Apr. 6, 2010).

[8] *See* Complaint ¶¶ 1–3, Ex. 1 at 4, *SEC v. Blackout Media Corp.*, No. 09-cv-5454 (S.D.N.Y. June 12, 2009); SEC Charges Penny Stock Company and Canadian Citizen With Illegal Stock Distribution Through Corporate Spinoffs, Litigation Release No. 21,083, 96 SEC Docket 435 (June 12, 2009).

[9] *See* Press Release, United States Attorney's Office for the Eastern District of New York, Canadian Citizen Sentenced to 78 Months in Prison for Leading an International Multimillion Dollar Fraud Scheme (Aug. 17, 2016), https://www.justice.gov/usao-edny/pr/canadian-citizen-sentenced-78-months-prison-leading-international-multimillion-dollar.

In May 2005, Berkshire Collection reincorporated in Oregon.[10] In January 2007, it changed its name to Mynewpedia Corp. and adopted the trading symbol "MYNW." *Id.* Approximately one year later, the corporation merged with Club Vivanet, Inc., adopted that name, and changed its trading symbol to "CLVV." *See id.* at 1–2. Club Vivanet described itself as "a global marketing company delivering a range of products and services through a network of IGC's (Independent global consultants) around the world." *Id.* at 4. Its balance sheet for the period ended March 31, 2008, listed assets of $7,441 (literally; not expressed in thousands), and its statement of operations disclosed an operating loss of $678,669, a net loss of $10,670, and a total of 8,300,000 shares issued and outstanding. *Id.* at 13–14.

In 2009, the company changed its name to "Medical Marijuana, Inc." as part of a transaction in which control passed to Bruce Perlowin, a convicted marijuana smuggler and self-described "King of Pot."[11] The company disclosed that it would now "provide institutional level financial systems to local, state and federal governments, testing and certification services, education programs, consulting and turn-key solutions to all levels

_____

[10] *See* Club Vivanet, Inc., Initial Information and Disclosure Statement 2 (July 14, 2008).

[11] *See* Medical Marijuana, Inc., Q2 2009 Information and Disclosure Statement 2–4, 10 (Nov. 25, 2009); Eric Malnic, *Drug Entrepreneur Tells His Story From Jail*, L.A. Times, Nov. 28, 1985, https://www.latimes.com/archives/la-xpm-1985-11-28-vw-9428-story.html; *see also* Josh Long, *Hemp, Marijuana Execs' Pasts Raise Concerns in Investor Community*, Natural Products Insider, July 23, 2014, https://www.naturalproductsinsider.com/regulatory/hemp-marijuana-execs-pasts-raise-concerns-investor-community.

of government and the Medical Marijuana Industry."[12] In 2016, the SEC charged Perlowin with fraud in connection with his subsequent marijuana-related venture, Hemp, Inc. According to the SEC's complaint, Perlowin and his co-defendants sold hundreds of millions of unregistered and purportedly unrestricted shares to public investors.[13]

In March 2011, Michael acquired a controlling interest in MJNA. According to MJNA's public filings:

> On March 23, 2011, an equity/asset exchange was effected between Hemp Deposit and Distribution Corp., a Delaware corporation ("HDDC") and Medical Marijuana, Inc. (the "Company" or "MMI"). The equity/asset exchange called for the Company issuing 260,000,000 million [*sic*] shares of common stock to HDDC which required an increase in the authorized [*sic*] from 300,000,000 shares to 600,000,000 shares which increase was effective on March 28, 2011. The issuance of the 260,000,000 shares was affected [*sic*] on March 31, 2011. The resignation of all officers and directors of Medical Marijuana, Inc. with the appointment of interim officers and directors was also affected [*sic*] on March 28, 2011. Permanent appointments will be made in the near future.[14]

As a result of this transaction, HDDC came to own 51.4% of MJNA's common stock. *Id.* at 14. Michael controlled HDDC, which also did business as CannaBANK, Inc.[15]

---

[12] *See* Medical Marijuana, Inc., Q2 2009 Information and Disclosure Statement 5 (Nov. 25, 2009).

[13] *See* Complaint ¶¶ 2, 16, *SEC v. Hemp, Inc.*, No. 2:16-cv-1413 (D. Nev. June 20, 2016); SEC Charges Issuer, Its CEO, and His Associates with Engaging in a Fraudulent Scheme to Evade the Registration Provisions of Section 5 of the Securities Act of 1933, Litigation Release No. 23,575, 114 SEC Docket 2385 (June 21, 2016).

[14] Medical Marijuana, Inc., Q1 2011 Information and Disclosure Statement 4–5 (July 5, 2011).

[15] *See* Medical Marijuana, Inc., Q2 2011 Information and Disclosure Statement 13 (Aug. 26, 2011). MJNA's disclosures have described CannaBANK as "a mergers and acquisitions firm specializing in the capitalization and development of national and

In its first filing after the acquisition, MJNA disclosed that "the continuing development of the issuer's multi-faceted business plan developed a loss."[16] As of March 31, 2011, just after the acquisition, MNJA reported total assets of $74,376.39, including current assets of $598.47. *Id.* at 18. It reported goodwill of negative $46,779,037 and retained earnings of negative $2,497,531.55. *Id.* The company had issued 506,049,062 shares, of which 115,855,872 were held by the public. *Id.* at 3. MJNA was, for all intents and purposes, a shell corporation with a catchy ticker symbol.

After the HDDC transaction, Michael took over as interim president of MJNA.[17] He later became MJNA's president and a director.[18] Michelle Sides, the Chief Operating Officer of HDDC/CannaBANK, assumed the roles of Chairman and Chief Operating Officer.[19] The new management team reoriented the company towards "cannabidiol (CBD)

_____

international hemp based companies." *Id.* MJNA's disclosures have also described CannaBANK as "a conduit through which assets are transferred from HDDC to [MJNA]" pursuant to the equity/asset exchange agreement between HDDC and MJNA. *Id.* at 12.

[16] Medical Marijuana, Inc., Q1 2011 Information and Disclosure Statement 15 (July 5, 2011).

[17] *See* Medical Marijuana, Inc., Q2 2011 Information and Disclosure Statement 12–13 (Aug. 26, 2011).

[18] *See* Medical Marijuana, Inc., Q3 2011 Information and Disclosure Statement 13 (Jan. 4, 2012). In its filings for the periods ending June 30, 2012, and September 30, 2012, MJNA returned to describing Michael as "Interim President." *See* Medical Marijuana, Inc., Q2 2012 Information and Disclosure Statement 21 (Sept. 25, 2012) ("Director, Interim-President"); Medical Marijuana, Inc., Q3 2012 Information and Disclosure Statement 21 (Nov. 27, 2012) (same).

[19] *See* Medical Marijuana, Inc., Q2 2011 Information and Disclosure Statement 14 (Aug. 26, 2011); Medical Marijuana, Inc., Q3 2011 Information and Disclosure Statement 12 (Jan. 4, 2012); Medical Marijuana, Inc., Q2 2012 Information and Disclosure Statement

9

extract."[20]

Under Michael's control, MJNA continued its practice of issuing massive amounts of stock. During the second quarter of 2011, MJNA issued 17,501,947 shares. "Consultants" received 12,238,800 shares "for establishing and assisting the corporation," and private investors received 5,263,147 shares.[21] During the third quarter of 2011, MJNA issued 30,014,755 shares. Most went to consultants or to pay for a trademark.[22] As of December 31, 2011, MJNA reported 558,565,764 shares outstanding.[23] As of December 31, 2012, it reported 808,238,318 shares outstanding. *Id.* During subsequent years, MJNA kept pumping out shares. As of December 31, 2018, MJNA had an authorized capitalization of five billion total shares. Of this amount, 3,562,197,168 were issued and

---

21 (Sept. 25, 2012); Q3 2012 Medical Marijuana, Inc., Information and Disclosure Statement 21 (Nov. 27, 2012).

[20] *See* Medical Marijuana, Inc., Q3 2011 Information and Disclosure Statement 11 (Jan. 4, 2012) (disclosing that "currently the entire Company product and service portfolio is being evaluated by new management for marketability and profitability," then discussing MJNA's "current products" as including cannabidiol extract); *see also* Steven Tr. 52–53 (discussing MJNA's transition to CBD products).

[21] *See* Medical Marijuana, Inc., Q2 2011 Information and Disclosure Statement 19 (Aug. 26, 2011).

[22] *See* Medical Marijuana, Inc., Q3 2011 Information and Disclosure Statement 18 (Jan. 4, 2012).

[23] *See* Medical Marijuana, Inc., 2012 Information and Disclosure Statement 4 (Apr. 24, 2013).

outstanding, with 2,148,156,858 in the public float.[24]

## B.     The Company

The United States Department of Justice unsealed Michael's indictment on September 14, 2012. The next business day, he resigned from his positions with MJNA. Sides and other executives continued in their roles.[25]

One week after Michael's indictment, Sides formed the Company.[26] In November 2012, Sides transferred the entire member interest to Titus for nominal consideration. Concurrently, Titus granted Michael an option to buy 90% of the Company's member interests for nominal consideration. JX 11; JX 12.

The record does not clearly reveal what role Titus occupied at the time in the MJNA family of companies, nor the nature of his relationship with Michael. He first appeared in MJNA's public filings in its 2014 annual report, where he is listed as "Chief Executive Officer, President and Director."[27] The filing recites that Titus "began his association with our family of companies in 2009, playing a pivotal role in raising capital among several

_____

[24] *See* Medical Marijuana, Inc., 2018 Information and Disclosure Statement 3 (Apr. 17, 2019).

[25] *See* Medical Marijuana, Inc., 2012 Information and Disclosure Statement 15–16 (Apr. 24, 2013).

[26] JX 7; *see* Titus Dep. 38 (describing Sides as "an attorney who was a close associate of Michael Llamas"). The Company originally was named Greater Hemp, LLC, then changed its name to General Hemp, LLC, before finally settling on Stone Ash, LLC. The name changes are not important for purposes of this case. *See* JX 7; JX 9; JX 23.

[27] Medical Marijuana, Inc., 2014 Information and Disclosure Statement 12 (May 14, 2015).

11

other duties." *Id.* The plaintiffs say that "Titus was an early stockholder in [MJNA] and invested prior to Michael's involvement." Dkt. 126 at 7. They also say that "[b]y March of 2015, Titus was named as CEO" of MJNA. *Id.* at 8.

In April 2014, eighteen months after Sides formed the Company, Michael exercised his option and acquired 90% of the member interests from Titus.[28] Also in April 2014, the Company created Kannaway, LLC, which distributed CBD-based products through relationship-based, multi-level marketing. *See* JX 89 at '055. In December 2014, the Company sold Kannaway to MJNA for 833,333,333 shares of common stock.[29] The Company had also loaned $1,403,331 to MJNA. *Id.* at 31.

The Company has generated cash by regularly selling MJNA shares in the open market. *See* Titus Dep. 41–43. Rule 144 of the Securities Act of 1933 permits an affiliate of an issuer to sell in each quarter a number of unregistered shares that does not exceed 1% of the issuer's outstanding shares. *See* 17 C.F.R. § 230.144(b)(2) & (e)(1)(i); JX 89 at '058 ("Every 90 days, [the Company], as affiliates of MJNA [*sic*] is allowed by SEC rules to sell up to 1% of the outstanding shares in MJNA."). Relying on this rule, the Company can sell a considerable number of shares. For example, between November 13, 2017, and

---

[28] JX 15. Immediately before transferring the 90% stake to Michael, Titus made himself Chairman of the Executive Committee. JX 13. After the transfer, Michael and Titus executed a written consent appointing Michael "as a Manager and member of the Executive Committee of the Company." JX 14.

[29] *See* Medical Marijuana, Inc., 2014 Information and Disclosure Statement 9 (May 14, 2015) (referring to the Company as "General Hemp LLC").

September 12, 2018, the Company sold 71,257,999 shares of MJNA for approximately $7,012,244. JX 150 at 19.

The Company uses the money it raises to pay its expenses and to fund the operations of MJNA and its affiliates. MJNA has struggled to generate operating income and depends on the Company's injections of capital for its financial viability.[30]

Despite having resigned from his positions with MJNA in September 2012, Michael continued to manage its operations. It appears that he initially did so through HDDC. Later, he did so through the Company.[31] Although Titus assumed the role of CEO at MJNA at some point in 2014, he focused on the promotional and public-facing aspects of the business.[32]

---

[30] *See* JX 141 ¶ 6 [hereinafter Arabia Aff.] ("MJNA has a market capitalization of approximately $300M; for the year ending December 31, 2017, it reported an operating loss of approximately $1.6M (not including non-recurring extraordinary impairment charges)."); Titus Dep. 43–46 (testifying that MJNA has funded losses with stock sales "many times" but claiming that MJNA recently "has performed to the point where [it] is not requiring outside money from our private equity group to maintain itself and continue operations").

[31] *See* Titus Tr. 169; Arabia Aff. ¶ 4. For example, in its 2016 annual report, MJNA disclosed in the notes to its financial statements that it paid the Company $250,000 per month in return for management consulting services "in a variety of areas including but not limited to; management and personnel, marketing and sales, investment banking, mergers and acquisitions, legal and accounting, corporate finance, media and public relations and investor services." Medical Marijuana, Inc., 2016 Information and Disclosure Statement 29 (Apr. 17, 2017). The monthly amount also covered rent for MJNA's office space. *Id.*

[32] Titus Tr. 169; Titus Dep. 97; *see* Steven Tr. 54 (testifying that Titus was a "spokesperson" and "educated in the uses of CBD" but was uninvolved in "day-to-day operations").

## C. Arabia

In early 2014, while under indictment and around the same time that he exercised his option to acquire 90% of the Company's member interests, Michael met Arabia through a mutual friend. Arabia considers himself a veteran of corporate disputes and "parliamentary maneuvers" in boardrooms.[33] His career in finance began in the 1980s, when he worked on high-yield debt offerings. During that decade, he was part of at least one hostile takeover attempt—involving I.C.H. Corporation—that generated litigation in this court.[34] In the late 1990s, he served as CEO of I.C.H. Corporation until the board terminated him. *See* Arabia Dep. 28–29; Arabia Aff. Ex. A. He then served as CEO of Naturewell, Inc., a company that traded over the counter under the symbol "NAWL." Arabia left Naturewell when its assets were liquidated. *See* Arabia Tr. 229; Arabia Aff. Ex. A. Naturewell's public filings indicate that in March 2013, it recast itself as Brazil Interactive Media, Inc. and began trading under the symbol BIMI; then, in September 2014, it became American Cannabis Company, Inc., which continues to trade over the counter under the symbol "AMMJ."[35]

After meeting Michael, Arabia became his trusted advisor on financial and legal

---

[33] Arabia Dep. 57; *see id.* at 49–51; Arabia Tr. 264–65.

[34] *See* Arabia Aff. Ex. A; Arabia Tr. 227 (describing his experience with "takeovers and things of that sort"); *id.* at 264–65 (describing takeover experience); Arabia Dep. 55–56 (describing effort to take over I.C.H. Corporation). *See generally Cottle v. Carr*, 1988 WL 10415 (Del. Ch. Feb. 9, 1988) (Allen, C.) (addressing application for temporary restraining order involving tender offer for stock of I.C.H. Corporation).

[35] *See* American Cannabis Company, Annual Report 7 (Form 10-K) (Apr. 15, 2019).

matters and an informal consultant to the Company and its affiliates. *See* Arabia Aff. ¶¶ 3, 7; Arabia Tr. 230. Although fulfilling these roles became his main occupation, Arabia did not receive any formal compensation for his services. *See* Arabia Dep. 39, 48–49. He benefitted instead by being able to purchase shares from MJNA at a discount in private placements or through other financing transactions.[36] One of Arabia's affiliates, TL-66, LLC, has amassed sizeable holdings in MJNA.[37]

Through his relationship with Michael, Arabia achieved a remarkable financial turnaround. Arabia had just declared personal bankruptcy in 2013, the year before he met Michael. *See* Arabia Dep. 53–55; Arabia Tr. 264. Arabia's bankruptcy came fresh off his defeat in a preemptive lawsuit in which he had tried to prevent foreclosure on his home.[38] Yet by 2016, TL-66 had loaned nearly $10 million to the Company, secured by a first-priority lien on all of the Company's assets. *See* JX 136. Two of the witnesses in the case believe that Michael parked funds with Arabia to protect against the forfeiture risk posed by his indictment.[39] That seems more plausible than the notion that Arabia's wife, who owns 100% of TL-66, advanced millions of dollars to the Company. She is a personal trainer who, as of 2017, was still challenging a $40,000 judgment against her for unpaid

---

[36] *See* Arabia Dep. 48; Titus Tr. 170; Titus Dep. 53–54.

[37] *See* JX 136 (promissory notes with Arabia signing as President of TL-66).

[38] *See Arabia v. BAC Home Loans Servicing, L.P.*, 145 Cal. Rptr. 3d 678 (Cal. Ct. App. 2012).

[39] *See* Steven Tr. 55–57; Silverman Dep. 127, 142–43, 145; *see also* JX 86.

credit card debt.[40] It likewise seems plausible that the creation of the Company itself, coming so promptly after Michael's indictment, along with the indirect and temporally delayed manner by which Michael acquired a less-than-100% interest, was part of an effort to restructure Michael's assets to mitigate forfeiture risk.

Over the course of his career, Arabia established a close business and personal relationship with Huemoeller. The two men started out as bond traders with the same firm in 1982, and they have remained close ever since.[41] When Huemoeller founded a company called HumWare Media Corporation, which trades over the counter under the symbol "HMWM," he hired Arabia as a consultant. Huemoeller Dep. 16–17. When Arabia served as CEO of Naturewell, he brought Huemoeller onto the board. *See id.* at 17. After becoming Michael's trusted advisor, Arabia arranged for Huemoeller to join the board of AXIM Biotechnologies, Inc., a firm controlled by MJNA that is also involved in the cannabinoid industry and whose shares trade in the over-the-counter market under the trading symbol "AXIM." *See id.* at 7–8; Titus Tr. 173; JX 89 at '056. Through the events giving rise to this litigation, Arabia secured a position for Huemoeller as a manager of the Company. Since then, he has hired Huemoeller as a consultant to TL-66 and Cross & Company, another entity that Arabia controls. *See* JX 168 at 2; Huemoeller Dep. 10–13. Except for a board fee from a company called Pledge Petroleum, all of Huemoeller's income comes

---

[40] *See* JX 114; *see also* Arabia Tr. 243 (testifying to wife's ownership of TL-66).

[41] JX 168 at 3; Arabia Tr. 234–35; Huemoeller Dep. 18–20.

from positions traceable to Arabia:

| Company | Stated Payments | Annualized Payments |
|---|---|---|
| AXIM | $5,000/quarter + $25,000 stock payment annually | $45,000 (11.39%) |
| Pledge Petroleum | $5,000/month | $60,000 (15.19%) |
| Air Water Earth | $0 | $0 (0%) |
| TL-66 and Cross & Co. | $20,000/month | $240,000 (60.76%) |
| Stone Ash | $10,000/quarter + $10,000 bonus to join as Manager | $50,000 (12.66%) |
| | | TOTAL: 395,000 (100%) |

Arabia also established close business and personal relationships with Scott, a recently retired pastor. The two met over twenty-five years ago when Scott presided over a funeral that Arabia attended. Between 1993 and 2006, Arabia belonged to Scott's congregation, and Scott has performed services over the years for Arabia and members of his family, including Arabia's marriage, his daughters' marriages, and his in-laws' funerals. While CEO of I.C.H. Corporation, Arabia secured a board seat for Scott, and when other directors voted to terminate Arabia, Scott immediately resigned. Scott Dep. 14–16. Scott's service on the I.C.H. board led to a directorship at Naturewell, where Scott recommended Arabia for the CEO spot. *Id.* at 16–17; *see also* Arabia Dep. 114–15. After becoming involved with Michael, MJNA, and their affiliates, Arabia secured seats for Scott on the boards of MJNA and AXIM. *See* Arabia Dep. 114; Scott Dep. 9–10. Through the events giving rise to this litigation, Arabia obtained a position for Scott as a manager of the Company. Since then, Scott has been seated as a director to KannaLife Sciences, another MJNA portfolio company. Scott Tr. 279–80. Other than some salary for his service to a

non-profit, all of Scott's income is traceable to Arabia:

| Company | Stated Payments | Annualized Payments |
|---|---|---|
| AXIM | $30,000/year | $30,000 (23.08%) |
| MJNA | $20,000/year | $20,000 (15.39%) |
| Hope Rescue | $30,000/year (previously $0) | $30,000 (23.08%) |
| Stone Ash | $10,000/quarter + $10,000 bonus to join as Manager | $50,000 (38.46%) |
| KannaLife | N/A | N/A |
| | | TOTAL: $130,000 (100%) |

Given their longstanding personal and business relationships, Huemoeller and Scott are loyal to Arabia. *See* Huemoeller Dep. 51–52; Scott Dep. 62–63. During the events giving rise to this suit, Scott promised Arabia that "everything you say is confidential and I'm very loyal to you and our friendship." JX 111. Arabia testified that he would do "a million-dollar deal on a handshake" with either of them. Arabia Dep. 186.

## D.     November 5: Michael's Death

In the early morning hours on Sunday, November 5, 2017, Michael died in a car accident. He was thirty years old. After hearing the news, Arabia put in motion a plan to gain control over the Company.

On the day Michael died, Arabia visited Steven, Michael's father. Steven spent most of his professional life as a police officer, then after leaving the force, took jobs in customer service and sales. When Michael got started in the real estate industry, he hired his father to handle customer service. In 2014, after moving into the cannabis business, Michael again hired his father. Steven had only limited contact with Arabia before Michael's death.

After offering his condolences, Arabia asked Steven about settling Michael's estate.

18

During the conversation, Arabia told Steven that they must not "under any circumstances, allow a forensic audit of the companies." Steven Tr. 58. Arabia also proposed adding Huemoeller and Scott as managers of the Company, observing that Titus "wasn't capable of handling the job of running the day-to-day operations by himself." *Id.* at 58–59. Despite expressing this opinion of Titus, Arabia said that they should increase Titus's salary. My sense is that Arabia wanted to offer Titus more money so that he would go along with the plan to add additional managers.

Steven believed that at least one manager should be a member of the Llamas family. He wanted a family member who could look out for the interests of Michael's minor child, who would eventually inherit Michael's 90% economic interest in the Company.

Arabia responded by telling Steven that Titus would likely go along with his plan, not Steven's, because Titus needed money. Arabia also offered to provide the Llamases with $500,000, which he suggested would help with any financial difficulties they might encounter after Michael's death. Steven interpreted this offer as a bribe. *Id.* at 59–60.

That evening, Arabia contacted Huemoeller and Scott about serving as managers of the Company. Both agreed immediately. Huemoeller Tr. 270; Scott Tr. 279.

E.      **November 6: Meetings at Arabia's House**

On November 6, 2017, Arabia hosted an emergency meeting of the MJNA board in his home. Arabia was not a member of the board, but he hosted the meeting anyway. Arabia did not invite Steven or Jeffrey, but they too attended anyway.

Arabia opened the board meeting by proposing to double Titus's salary as CEO. He then asked Steven and Jeffrey whether Michael had a will. Steven and Jeffrey were

19

surprised by this question, because they understood that Arabia had custody of Michael's will. *See* Steven Tr. 61; Jeffrey Tr. 120. No will has ever been found.

Once the board adjourned, Arabia and Titus met privately. Arabia told Titus that Michael would not have wanted Titus running the Company alone and would have wanted Arabia to be involved. Arabia Tr. 259–60; Arabia Dep. 121–22. Arabia stressed that Titus should appoint additional managers whom Michael and Arabia trusted. Arabia Aff. ¶ 9. Arabia suggested Huemoeller and Scott, who Arabia said would act primarily as Titus's advisors. Titus was concerned about compensation that he felt the Company owed him. Arabia assured Titus that Huemoeller and Scott would "never play any games with [Titus] getting [his] fair share." Arabia Dep. 122.

After his private meeting with Titus, Arabia circled up with Steven and Jeffrey. Arabia told them that he wanted to appoint two individuals as managers whom he had known for a long time and could rely on, mentioning Scott and Huemoeller. *See* Steven Tr. 61; Jeffrey Tr. 120–21. Steven reiterated that he wanted a member of the Llamas family to serve as a manager. Steven Tr. 61–62. Arabia again offered to help out the Llamas family, this time with 100 million shares of MJNA stock. *Id.* at 62.

**F.  November 7: Titus Appoints Huemoeller and Scott.**

Arabia drafted the November 7 Consent with the assistance of counsel. *See* Arabia Tr. 261. It called for Titus to act in his capacity as "Sole member of the Executive Committee and Sole Manager" to appoint Huemoeller and Scott "as members of the Executive Committee and Managers of the Company." JX 27. On November 7, 2017, Titus executed it. PTO ¶ 8.

By signing the November 7 Consent, Titus gave Arabia control over the Company at the manager level. The Original LLC Agreement stated:

> The responsibility for the management and oversight of the operation and affairs of the Company shall be and are [*sic*] hereby vested in an Executive Committee, which shall consist of at least one (1) and not more than five (5) members. Each of the members of the Executive Committee shall be designated as a Manager for purposes of this agreement, with one of the Managers designated by a vote of the Executive Committee to act as Chairman. No Manager need be a Member of the Company . . . .

JX 10 § 5.1. As a majority of the Executive Committee, Huemoeller and Scott could outvote Titus and exercise control over the Company.

In addition, if they wished, Huemoeller and Scott could remove Titus as a manager without cause. Section 5.5 of the Original LLC Agreement provided as follows:

> One or more of the Managers may be removed, with or without cause, by action of the Executive Committee. A Manager may be removed if the number of votes cast in favor of removing such Manager exceeds the number of votes cast against removal. The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

*Id.* § 5.5. As a majority of the Executive Committee, Huemoeller and Scott could exercise this right.

## G.     November 11: Michael's Celebration of Life

Michael's funeral services were held on Saturday, November 11, 2017. The funeral was followed by a celebration of life held at the Fairmont Grand Del Mar in San Diego. That night, Arabia hosted guests in his hotel room. Vilchis, Michael's girlfriend, attended and overheard Arabia and Huemoeller talking about their success in getting Titus to sign

21

over control of the Company.[42]

**H.      November 12: Titus Meets With Silverman.**

After signing the November 7 Consent, Titus had reached out to Silverman, a lawyer who had acted as the Company's outside counsel on various matters. *See* JX 31; Silverman Dep. 21–22. Titus asked to meet with Silverman on Sunday, November 12, the day after the funeral. *See* Silverman Tr. 11. Silverman and Vilchis were partners in another cannabis-related venture and were already planning to meet for breakfast that day. To Silverman's surprise, Titus joined them for breakfast. I infer that Vilchis, who was friends with Titus, invited him after hearing Arabia and Huemoeller's comments the night before. *See id.*

During the meeting, Silverman explained the implications of appointing Huemoeller and Scott, including that they could outvote Titus on the Executive Committee and remove him as a manager. *Id.* at 7–8; Titus Tr. 201–02. Until his meeting with Silverman, Titus

---

[42] Vilchis testified that Arabia and Huemoeller "were high-fiving in the air, parading the fact that they were able to get Stuart Titus to sign over the company and appoint two men on the board." Vilchis Dep. 13; *see id.* at 86. Arabia and Huemoeller disputed her account, and they particularly scoffed at the idea that they were high-fiving or parading.

My personal impression is that Vilchis recalled Arabia and Huemoeller's behavior in exaggerated terms, but got the gist right. In evaluating Vilchis's testimony, I have taken into account that human memory is a fallible medium, that Vilchis is currently aligned with Llamas family and averse to Arabia and Huemoeller, and that Michael's death was a difficult and emotional experience for her. In light of these factors, it would not be surprising for her to remember Arabia and Huemoeller's behavior as more dramatic than it was. At the same time, it is credible to me that Arabia and Huemoeller would have expressed satisfaction about getting Titus to sign the November 7 Consent, and they could well have commented, as Vilchis testified, that Titus was "stupid" and "didn't even ask for a lawyer prior to signing." *Id.* at 87–88.

22

thought that Huemoeller and Scott were serving as business advisors; he did not realize they could outvote him, much less fire him. Titus asked Silverman to "undo" what he had done and "fix it."[43]

Silverman agreed to look into it. After the meeting, Titus sent Silverman an email that attached a copy of the November 7 Consent. *See* JX 33. In the body of the email, Titus offered a confused and unpersuasive rationalization about why he did not believe he had done anything meaningful by signing it, positing that it related to a different entity. *See id.* Titus also sent Silverman the Original LLC Agreement. JX 34. They agreed to meet for breakfast at the Fairmont Grand Del Mar at 8:00 a.m. the next day. *Id.*

Silverman appears to have told Vilchis about the meeting and invited her to attend. Vilchis then reached out to Jeffrey and invited him to join. *See* JX 35; JX 37.

## I. November 13: Titus Switches Sides.

On the morning of Monday, November 13, 2017, Titus met with Silverman and Vilchis for breakfast at the Fairmont Grand Del Mar. Jeffrey joined the meeting partway through. Titus was shocked and upset that he had signed the November 7 Consent and worried about the implications of turning over control of the Company to Arabia.[44] The

---

[43] Silverman Tr. 9; *see id.* at 9–10 ("[Titus] didn't ask me to draft a specific document, but rather, asked if I could do something that would fix it. And by 'fix it,' meaning remove them and appoint somebody else."); JX 48; Titus Dep. 131–36.

[44] *See* Silverman Tr. 16–18; Vilchis Dep. 19, 33–36; JX 45 (Vilchis contemporaneously texting Jeffrey, "Stu is so shocked and upset."). In an unsent email that Titus authored later that day, he wrote: "Hope Steven S was able to come up with a working

group discussed reconvening that evening at Jeffrey's house.

After the meeting, Silverman asked a Delaware attorney for an informal reaction to Titus's suggestion that the November 7 Consent related to a different entity. *See* JX 46. Not surprisingly, Titus's rationalization did not pan out.

Silverman had a first-year associate prepare drafts of what became the Amended LLC Agreement and the November 13 Consent. JX 47; *see* Silverman Dep. 122. Silverman made a few changes to the draft Amended LLC Agreement; he did not make any changes to the draft November 13 Consent.[45]

That evening, Titus, Silverman, Steven, Jeffrey, and Jeffrey's wife, Shannon Llamas, gathered at Jeffrey's house. Silverman brought with him an unexecuted copy of the Amended LLC Agreement and an unexecuted copy of the November 13 Consent.

After food was delivered, the group gathered around a kitchen island. Titus said he had made a "terrible mistake" by giving Arabia control. Steven Tr. 65–66. Silverman summarized the documents. He told Titus that the documents removed Huemoeller and Scott and elected Steven and Jeffrey. *Id.* at 67, 71; Silverman Tr. 22–33. Titus skimmed

---

solution – and huge apologies for almost ruining a potentially great thing." JX 48; *see* Titus Dep. 131–32.

[45] *See* Silverman Tr. 29 ("A. Did you and [your associate] draft this first amended LLC Agreement? A. Yes. Q. What was the purpose -- A. [The associate] did the drafting. Q. And you reviewed it and had comments? A. Yes. I reviewed it, yes."); Silverman Dep. 83 ("Q. Did you review [the November 13 Consent]? A. Yes. Q. Did you give comments on [the November 13 Consent]? A. No.").

them quickly, then signed.[46]

The Original LLC Agreement had established a manager-managed structure, vested management authority in an "Executive Committee" of "not more than five (5) members," and designated each member of the Executive Committee "as a Manager." JX 10 § 5.1. The Amended LLC Agreement abandoned the language of the Executive Committee and provided instead that the "sole Member and Manager may appoint a Board of Managers" of "up to three (3) Managers." JX 41 § 7. It described Titus as the sole member and manager. That description was only half right: Titus was the sole member, but he was not the sole manager. By executing the November 7 Consent, Titus had appointed Huemoeller and Scott as additional managers.

The November 13 Consent contained similar recitals about Titus being the sole member and manager. It stated:

> The undersigned [Stuart Titus], being the sole Member and sole Manager of [the Company], does hereby adopt the following resolutions by written consent effective as of November 13, 2017:
>
> 1. Pursuant to Section 7 of the current [Company] Operating Agreement, a Board of Managers is hereby formed to govern the day-to-day affairs of the Company.
>
> 2. The Board of Managers of [the Company] are [*sic*], and each acting alone is [*sic*], hereby authorized to do and perform any and all such acts, including execution of any and all documents and certificates, as such Managers shall deem necessary or advisable, to carry out the purposes and intent of the Company. Any and all actions heretofore or hereafter taken by the Board of Managers in connection herewith are approved, ratified and confirmed in all respects as the act of the

---

[46] Silverman Tr. 23–28; Steven Tr. 67–70; Jeffrey Tr. 130–31.

25

Company.

3. The Board of Managers shall initially consist of the following three (3) Managers: Steven Llamas, Jeff Llamas, and Stuart Titus.

4. Each member of the Board of Managers shall serve until his or her successor shall be duly elected, unless he or she resigns, is removed from the Board or is otherwise disqualified from serving.

JX 43. Silverman signed the November 13 Consent in his capacity as "Member." *Id.*

The November 13 Consent did not purport to remove Huemoeller or Scott as managers. Silverman testified that in his opinion, by reciting that Titus was the sole manager, the Amended LLC Agreement removed every manager other than Titus. As a result, he believed that Titus could fill the vacancies by executing the November 13 Consent. *See* Silverman Tr. 29.

In my judgment, Silverman's opinion is a *post hoc* rationalization. I think the first-year associate overlooked the issue of removing Huemoeller and Scott, and Silverman did not catch it. They were working quickly, and it is particularly easy to make drafting mistakes when dealing with LLCs, which often involve bespoke governing documents. If Silverman or his associate had spotted the issue, then they would have taken the easy step of providing expressly for the removal of Huemoeller and Scott. There was no need to risk having the validity of their fix turn on the prospect of an inaccurate recital having substantive effect. Silverman and his associate similarly did not spot a problem that the defendants would fixate on in this litigation, namely that the Amended LLC Agreement provided that "[i]n each Fiscal Year of the Company, all profits and losses shall be allocated to the sole Member." JX 41 § 3. Although it was true that Titus was the sole member as a

result of Michael's death, it was not true that all profits and losses would go to him. Instead, as the holder of an assignee interest resulting from the transfer of Michael's units by operation of law, Michael's estate would receive its *pro rata* share. By adopting this provision, the Amended LLC Agreement erroneously purported to divest Michael's estate of its economic interest in the Company, which no one intended.

After signing the documents, Titus left and joined Arabia, Huemoeller, and Scott at a restaurant where they had agreed to meet to discuss the Company. Titus arrived late, gave a false excuse, and did not mention the documents he had signed. The group was already discussing plans to increase Titus's compensation. *See* Scott Dep. 32–42; Huemoeller Dep. 28–32.

**J.      The Las Vegas Conference**

After the events of November 13, 2017, Titus, Silverman, and Vilchis went to Las Vegas for a marijuana industry conference. Titus invited Jeffrey to join them, and he and Shannon arrived by November 16. While there, the group discussed Michael's estate and the Company's organizational structure. *See* Jeffrey Tr. 133–34; Silverman Dep. 86–93, 96–100. Titus drafted a discussion document that listed Steven, Jeffrey, and himself as the Company's managers. *See* JX 89 at '055.

During the conference, Titus began worrying about how Arabia would react, and he texted with Steven about Arabia's ability to retaliate. *See* JX 186; JX 187. Titus feared that Arabia could sell off TL-66's sizeable stock position and drive "MJNA stock price down

27

to sub-penny."[47] That in turn would cut off the Company's cash flow by hurting its ability to sell shares.

On the morning of Saturday, November 18, 2017, Titus texted Jeffrey that Arabia had requested a meeting "re time sensitive matters." JX 187 at '645. Jeffrey texted back that Titus should not to "sign[] anything until we get it reviewed." *Id.* Titus agreed.

## K.       November 18: Titus Meets With Arabia.

On Saturday, November 18, 2017, the same day he returned from Las Vegas, Titus went to Arabia's house. Titus texted Jeffrey: "I will go to [Arabia's] house but if it gets testy I may have to call him out on his recording devices and make a hasty exit. Hopefully I can survive the meeting."[48]

Titus survived his meeting, but his resolve did not. At some point, Titus told Arabia that Silverman had him sign some documents. Titus Tr. 212; *see* Arabia Aff. ¶ 14. At Arabia's request, Titus retrieved the Amended LLC Agreement and the November 13 Consent from his car, and Arabia reviewed them.

According to Arabia, he was "surprise[d]," and "didn't understand why [Titus] had

---

[47] JX 186 at '652; *see id.* (Titus texting Steven that "[w]e need to have Silverman recommend an outside securities lawyer to review our MJNA convertible debt with both Chicago Venture and Arabia / TL-66. There is a chance that TL-66 may be an 'Affiliate' - which would prevent him from fully converting and dumping shares on the open market.").

[48] *Id.*; *see also id.* ("Jeffrey advising Titus to "[a]s soon as you walk in look at the wall on your left side. It's a nest cam. It may or may not have a light on."); Titus Tr. 213–14 ("[T]here had been talk that Mr. Arabia had some recording devices over at his -- his residence, and that Jeffrey . . . wanted me to be aware that if I was meeting over at his place, that I might be recorded."); Jeffrey Tr. 163.

28

signed them." Arabia Tr. 235. Titus explained that he signed the amendment to prevent Huemoeller and Scott from removing him. *Id.* at 236. Arabia proposed that Titus adopt a new LLC agreement that would contain provisions to address Titus's concern. Arabia Aff. ¶ 16.

After the meeting, Arabia contacted his lawyers and had them prepare documents that would reverse Titus's actions and restore Arabia's control. The next day, Titus met with Jeffrey and Steven, but he did not mention any plan to remove them.

## L.    The Final LLC Agreement and November 21 Consent

On Monday, November 20, 2017, Titus executed the Final LLC Agreement. PTO ¶ 11. It resembled the Original LLC Agreement, except that it protected Titus from removal by providing that a majority of the members would have to approve any decision to remove Titus as a manager.[49] To prevent Titus from switching sides again, the Final LLC Agreement provided that it could "be amended only by a written document signed by all of the Members and all of the Managers." *Id.* § 12.5.

On November 21, 2017, Titus executed the November 21 Consent in his capacity as the sole member.[50] Although the November 21 Consent provided for Steven and

---

[49] *See* JX 95 § 5.5 ("[A] Manager that is also a Member may only be removed from the Executive Committee by a vote of the majority of the Members and a majority of the members of the Executive Committee.").

[50] PTO ¶ 13; *see* JX 96 ("[E]ach of Steven Llamas and Jeffrey Llamas shall be removed as members of the Company's Board of Managers. . . . [P]ursuant to sections 5.1 and 5.4 of the [Final LLC Agreement], Timothy R. Scott and John W. Huemoeller II shall

Jeffrey's removal and Huemoeller and Scott's appointment, in reality it was a clean-up measure that affirmed the existing state of affairs. Later that day, Titus, Huemoeller, and Scott executed a written consent awarding Titus a salary of $120,000 at the Company. JX 97. The MJNA board increased Titus's salary at MJNA from $200,000 to $450,000.[51]

On November 22, 2017, Arabia contacted Steven and asked to meet with him and Jeffrey. They were unable to schedule a meeting for several days.

On November 27, 2017, Arabia texted Steven and Jeffrey that they had been removed as managers. He told them:

> [The Amended LLC Agreement] was re-amended by Stu [Titus] and is no longer in force and effect. The re-amendment was just a precaution because counsel does not believe that the Silverman amendment was valid for a number of reasons in the first place. But just in case Stu re-amended the operating agreement in order to put things back to where they were.

JX 25 at '158; *see* JX 99. On November 30, Steven and Jeffrey met with Arabia, and they accepted his explanation. Steven Tr. 72–74; Jeffrey Tr. 139–40. Arabia did not provide them with the operative documents, and they did not challenge his assertions or contact a lawyer. As they explained at trial, they were preoccupied with Michael's death and the death of a close family friend. *See* JX 25 at '158; Steven Tr. 104–05.

---

be, and hereby are, appointed as members of the Executive Committee and Managers of the Company.").

[51] *See* Titus Tr. 190 (describing January 2018 increase to $300,000 and June 2018 increase to $450,000); *see also* Silverman Tr. 36 (opining that "Arabia has control of MJNA by virtue of his control of the board" of the Company because Huemoeller and Scott "had loyalty only to [Arabia] and seemed to do whatever bidding he asked").

**M.  Arabia Cements Control.**

On November 29, 2017, the Company sold member interests to Arabia and TL-66. PTO ¶ 16. The issuance equaled approximately 6% of the Company's equity. The sale was intended to "require the vote of . . . Arabia and TL-66 for approval of any amendment" to the Final LLC Agreement. JX 150 at 15–16.

On February 7, 2018, Huemoeller formed Kettner Investments, LLC, a Delaware limited liability company. The Company promptly issued a member interest to Huemoeller. *Id.* at 14. Pursuant to a merger agreement dated February 26, 2018, the Company merged with Kettner, with Kettner as the surviving entity.

In response to rumors that Steven and Jeffrey might be considering litigation, Arabia sent Huemoeller a letter from TL-66 demanding possession of the stock certificates for the Company's portfolio companies.[52] The demand cited TL-66's security interest in the Company's assets as collateral for its loans to the Company. JX 136 at '828. The Company promptly complied. JX 137; JX 138.

**N.  This Litigation**

In May 2018, Jeffrey attended a meeting with Michael's estate administrator that involved reviewing Michael's assets. The administrator had a copy of the Final LLC Agreement, which the Llamases had not seen before. In early June 2018, Steven and Jeffrey consulted with Delaware counsel. They filed this lawsuit on July 16, 2018.

---

[52] JX 136; *see id.* at '870 (cover email re: "Demand for Collateral from Kettner - Time Sensitive - HIGH IMPORTANCE"); *see also* Arabia Dep. 98.

## II.     LEGAL ANALYSIS

Steven and Jeffrey seek rulings that they were properly appointed and never properly removed as managers of the Company. Section 18-110(a) of the Delaware Limited Liability Company Act (the "LLC Act") gives this court jurisdiction to address this issue:

> Upon application of any member or manager, the Court of Chancery may hear and determine the validity of any admission, election, appointment, removal or resignation of a manager of a limited liability company, and the right of any person to become or continue to be a manager of a limited liability company, and, in case the right to serve as a manager is claimed by more than 1 person, may determine the person or persons entitled to serve as managers; and to that end make such order or decree in any such case as may be just and proper, with power to enforce the production of any books, papers and records of the limited liability company relating to the issue. . . .

6 *Del. C.* § 18-110(a). This section is the "the limited liability company companion to 8 *Del. C.* § 225 governing corporations." *Pharmalytica Servs., LLC v. Agno Pharms., LLC*, 2008 WL 2721742, at *3 (Del. Ch. July 9, 2008). A proceeding under Section 18-110(a) "is summary in character, and its scope is limited to determining those issues that pertain to the validity of actions to elect or remove" a manager. *Genger v. TR Inv'rs*, 26 A.3d 180, 199 (Del. 2011) (describing 8 *Del. C.* § 225).

The plaintiffs contend that the Amended LLC Agreement removed Huemoeller and Scott as managers of the Company. As a fallback, they argue that the November 13 Consent removed Huemoeller and Scott. The plaintiffs contend that after Huemoeller and Scott's removal, the November 13 Consent filled the resulting vacancies with Steven and Jeffrey.

The defendants disagree and have spent the bulk of their effort disputing the validity of the Amended LLC Agreement. Whether the Amended LLC Agreement is valid turns on

questions of first impression under Section 18-705 of the LLC Act. But this decision need not reach those issues, because the defendants have a backup argument that is dispositive.

The defendants argue that even if valid, the Amended LLC Agreement did not remove Huemoeller or Scott as managers. It did, however, limit the Company to three managers. They also argue that the November 13 Consent did not remove anyone. Because there was never action taken to remove the incumbent managers, there were no vacancies for the November 13 Consent to fill. As the defendants see it, Steven and Jeffrey were never appointed as managers.

Everyone agrees that immediately before the adoption of the Amended LLC Agreement and the execution of the November 13 Consent, the Company's managers were Titus, Huemoeller, and Scott. Everyone also agrees that Section 7 of the Amended LLC Agreement limited the Company to three managers. Unless the plaintiffs can explain how Huemoeller and Scott vacated their manager seats, there was no room for Steven and Jeffrey to join the board.

## A.    Arguments Based on the Amended LLC Agreement

In their first set of arguments, the plaintiffs contend that Huemoeller and Scott lost their status as managers when Titus adopted the Amended LLC Agreement. They rely on the text of the Amended LLC Agreement, which refers in three places to Titus as the "sole Member and Manager" or a variant thereof. The plaintiffs contend that by adopting an LLC agreement that included this language, Titus necessarily removed Huemoeller and Scott. More generally, they argue that the adoption of the Amended LLC Agreement reset the Company's governance structure, opening the door to the appointments of Titus,

33

Huemoeller, and Scott.

In theory, an amendment to an LLC agreement could effectuate the removal of a manager or reset the governance structure of an LLC. *See* Robert L. Symonds, Jr. & Matthew J. O'Toole, *Symonds & O'Toole on Delaware Limited Liability Companies* § 9.05[C], at 9-53 to -54 (2d ed. & Supp. 2018) ("[I]t would appear that removal of a manager or an equivalent result may be achieved in the absence of a removal provision in the limited liability company agreement, for example, by an amendment of the agreement directed at that purpose."). The question is whether the language of the Amended LLC Agreement accomplished that task.

When construing and interpreting an LLC agreement, a court applies the same principles that are used when construing and interpreting other contracts. *Godden v. Franco*, 2018 WL 3998431, at *8 (Del. Ch. Aug. 21, 2018). "Delaware adheres to the objective theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party." *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014). When interpreting a contract, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement," construing the agreement as a whole and giving effect to all its provisions. *GMG Capital Invs., LLC v. Athenian Venture P'rs I*, 36 A.3d 776, 779 (Del. 2012). "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent." *City Inv. Co. Liquid. Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993). A court applying Delaware law will "construe the contract in accordance with that plain meaning and will not resort to extrinsic evidence to

determine the parties' intentions." *BLG Hldgs. LLC v. enXco LFG Hldg., LLC*, 41 A.3d 410, 414 (Del. 2012).

### 1. The Descriptive References

The plaintiffs initially rely on two aspects of the Amended LLC Agreement that describe Titus as the sole member and manager. One appears in the introductory clause, which states: "This [Amended LLC Agreement] . . . memorializes the ownership and management of the Company by the sole Manager and sole Member: Stuart Titus . . . ." JX 41 at 1. The other appears in a recital, which states: "[T]he sole Manager and sole Member desires to amend and restate the [Original LLC Agreement] in its entirety as set forth herein for the purposes of, and on the conditions set forth in, this [Amended LLC Agreement] . . . ." *Id.*

The reference in the introductory clause does not have substantive effect. The introductory clause of a contract typically identifies the nature of the contract, the parties to it, and its effective date. *See* Kenneth A. Adams, *A Manual of Style for Contract Drafting* 13–19 (4th ed. 2017). The introductory clause in the Amended LLC Agreement fulfills these tasks. It does not contain language of declaration that would establish an agreed-upon state of facts, nor does it contain language of performance by which a party performs a particular act. *See id.* at 51–57, 106–17. It is a descriptive clause, and in this case, it erroneously describes Titus as the sole manager.

The reference in the recital does not accomplish anything either. "Generally, recitals are not a necessary part of a contract and can only be used to explain some apparent doubt with respect to the intended meaning of the operative or granting part of the instrument. If

the recitals are inconsistent with the operative or granting part, the latter controls."[53] Recitals provide background and "may have a material influence in construing the contract and determining the intent of the parties," but they "do not have the force of contractual stipulations."[54] The recital in the Amended LLC Agreement is not an operative or granting part of the Amended LLC Agreement. It inaccurately described the existing state of facts.

Under these principles, the first two references on which the plaintiffs rely did not remove Huemoeller and Scott and make Titus the sole manager. Both described Titus as the sole manager, but errantly so.

### 2. The Substantive Provision

The third reference on which the plaintiffs rely appears in a substantive provision, but it is not a provision that declares that by virtue of the execution of the Amended LLC

---

[53] *New Castle Cty. v. Crescenzo*, 1985 WL 21130, at *3 (Del. Ch. Feb. 11, 1985) (citation omitted); *accord Glidepath Ltd. v. Beumer Corp.*, 2019 WL 855660, at *16 (Del. Ch. Feb. 21, 2019); *Creel v. Ecolab, Inc.*, 2018 WL 5778130, at *4 (Del. Ch. Oct. 31, 2018); *UtiliSave, LLC v. Miele*, 2015 WL 5458960, at *7 (Del. Ch. Sept. 17, 2015).

[54] *TA Operating LLC v. Comdata, Inc.*, 2017 WL 3981138, at *23 (Del. Ch. Sept. 11, 2017) (footnote omitted); *see Simpson v. City of Topeka*, 383 P.3d 165, 178 (Kan. Ct. App. 2016) ("[A] court cannot rely on a general statement of contractual purpose to alter the plain meaning of the operative terms of a particular substantive provision of the agreement." (collecting authorities)); 17A Am. Jur. 2d *Contracts* § 373, Westlaw (database updated May 2019) ("'Whereas clauses' are generally viewed as being merely introductory and since recitals indicate only the background of a contract, that is, the purposes and motives of the parties, they do not ordinarily form any part of the real agreement." (footnote omitted)); *see also United States v. Cmty. Health Sys., Inc.*, 666 Fed. App'x 410, 417 (6th Cir. 2016) (holding that recital "does not itself create a binding obligation" but nevertheless may "guide interpretation of the binding obligation in [a substantive provision], but only if [the substantive provision] is ambiguous in the first place").

Agreement, Huemoeller and Scott have been removed and Titus has become the sole manager. Instead, Section 7 of the Amended LLC Agreement states that "[t]he sole Member and Manager may appoint a Board of Managers (the 'Board') at any time." JX 41 § 7. While there are various ways to read this language, each of them leads to the conclusion that Huemoeller and Scott remained managers.

The first reading treats the language of Section 7 as another inaccurate description of the Company's then-existing number of managers, consistent with the incorrect statements in the introductory clause and the recitals. Read in this fashion, the language of Section 7 did not effectuate a removal. It merely continued the factual misapprehension apparent from earlier parts of the agreement. This is the most convincing reading.

The second reading treats the language of Section 7 as empowering a person who is "the sole Member and Manager" to "appoint a Board of Managers." When the Amended LLC Agreement was in effect, no one fit that bill. Titus was the sole member, but he was not also the sole manager. Because no one ever removed Huemoeller and Scott, there were three managers. As a result, Titus could not "appoint a Board of Managers."

A third reading treats the adjective "sole" as only modifying "Member," rather than modifying both "Member and Manager." Under this reading, Section 7 empowers someone who is the sole member and a manager to appoint a Board of Managers. Titus fit that bill, so he could have exercised the appointment power. Although Section 7 granted him that power under this reading, it did not declare that anyone else had been removed.

Assuming for the sake of discussion that Section 7 did declare that the Company would have only one manager, there is reason to doubt that this language would be effective

to remove existing managers. The Delaware Supreme Court has held that when an amendment to the bylaws or certificate of incorporation reduces the size of the board below the number of sitting directors, and when the amendment takes place between annual meetings, that act does not remove any of the sitting directors. *See Crown EMAK P'rs, LLC v. Kurz*, 992 A.2d 377, 398–402 (Del. 2010). The existing directors continue to serve until they are removed or until their successors are elected and qualified at the next annual meeting. *Id.* at 401–02. Although *Crown EMAK* was a corporate case, its reasoning applies by analogy to a manager-managed LLC, particularly one like the Company that has adopted a corporate-style managerial structure.

> Using the contractual freedom that the LLC Act bestows, the drafters of an LLC agreement can create an LLC with bespoke governance features or design an LLC that mimics the governance features of another familiar type of entity. The choices that the drafters make have consequences. If the drafters have embraced the statutory default rule of a member-managed governance arrangement, which has strong functional and historical ties to the general partnership (albeit with limited liability for the members), then the parties should expect a court to draw on analogies to partnership law. If the drafters have opted for a single managing member with other generally passive, non-managing members, a structure closely resembling and often used as an alternative to a limited partnership, then the parties should expect a court to draw on analogies to limited partnership law. If the drafters have opted for a manager-managed entity, created a board of directors, and adopted other corporate features, then the parties to the agreement should expect a court to draw on analogies to corporate law. Depending on the terms of the agreement, analogies to other legal relationships may also be informative.

*Obeid v. Hogan*, 2016 WL 3356851, at *6 (Del. Ch. June 10, 2016) (footnotes omitted) (collecting authorities).

In this case, the Original LLC Agreement adopted a manager-managed structure in which the Executive Committee functioned like a corporate board of directors. *See* JX 10

38

§ 5.1 (charging Executive Committee with "responsibility for the management and oversight of the operations and affairs of the Company"). The Original LLC Agreement adopted corporate default rules for the managers' terms, stating that "[e]ach Manager shall hold office until such Manager has resigned or has been removed from office" and that "[n]o reduction of the authorized number of Managers shall have the effect of removing any Manager before that Manager's term of office expires." *Id.* § 5.3. The Amended LLC Agreement maintained the manager-managed structure and repeated the corporate analogy by calling for a Board of Managers. Because the Original LLC Agreement and Amended LLC Agreement made these choices, an amendment would be effective to remove incumbent managers only if it used the language of removal.

Citing this court's decision in *A & J Capital, Inc. v. Law Office of Krug*, 2018 WL 3471562 (Del. Ch. July 18, 2018), the plaintiffs assert that it is improper to "imply[] any requirements from the corporate context" to limit the manner by which the sole member of an LLC may remove managers. Dkt. 126 at 43 n.197. That argument misses the mark. In *A & J Capital*, this court correctly recognized that where an LLC agreement specifies the process for removing a manager, a court should not override the contract with a corporate law analogy.[55] In this case, the Original LLC Agreement drew on corporate parallels and

---

[55] *See A&J Capital*, 2018 WL 3471562, at *4 (declining to follow *Bossier v. Connell*, 1986 WL 12785, at *6 (Del. Ch. Nov. 12, 1986), and *Campbell v. Loew's, Inc.*, 134 A.2d 852, 859–60 (Del. Ch. 1957) (Seitz, C.), which required specific charges, adequate notice, and full opportunity to meet the accusations before a director could be removed for cause).

provided a process, which Titus did not follow, for removing existing managers.[56] The Amended LLC Agreement maintained the corporate analogy and did not declare that any managers had been removed. In this case, therefore, the defendants are not invoking corporate analogies to override express terms of the LLC agreement. They are relying on corporate parallels that logically apply and which seem to have appealed to the drafters of the Original LLC Agreement and the Amended LLC Agreement.

If any of the possible readings of Section 7 supported the plaintiffs' position, then I would treat the provision as ambiguous and resort to extrinsic evidence. In this case, however, every possible reading leads to the conclusion that Huemoeller and Scott remained managers.

### 3. The Governance Reset Argument

In their final argument, the plaintiffs contend that by adopting the Amended LLC Agreement, Titus "hit the reset button in terms of governance, as he was entitled to do as its sole Member." Dkt. 126 at 43. They posit that the Amended LLC Agreement wiped out the Company's existing governance structure, while also giving Titus the power under Section 7 of the Amended LLC Agreement to establish a Board of Mangers "at any time." *Id.*

The governance reset argument is internally inconsistent. When advancing this

---

[56] *See* JX 10 § 5.5 ("One or more of the Managers may be removed, with or without cause, by action of the Executive Committee. A Manager may be removed if the number of votes cast in favor of removing such Manager exceeds the number of votes cast against removal.").

argument in their post-trial opening brief, the plaintiffs accepted that Titus only had the power to appoint a Board of Managers if he was the "sole Member and Manager." *Id.* But if the Amended LLC Agreement reset the governance structure entirely, then it wiped out all of the managers, not just Huemoeller and Scott. The reset would have left the Company as a manager-managed LLC with no managers. Titus would only have been a member, and he would have lacked the ability to act under Section 7 as "sole Member and Manager."

In their post-trial reply brief, the plaintiffs attempted to fix this problem by arguing that the Amended LLC Agreement turned the Company into a member-managed LLC, while giving Titus "the authority to create a Board of Managers of up to three Managers." Dkt. 134 at 28. In other words, the plaintiffs appear to believe that the Company became a member-managed LLC that Titus could make manager-managed by resolution. The Amended LLC Agreement plainly did not do this. The LLC Act provides for a member-managed governance structure as the default regime for LLCs, and that regime can only be altered in an LLC agreement. *See* 6 *Del. C.* § 18-402. The Amended LLC Agreement established a manager-managed structure.

At best for the plaintiffs, if the Company truly reverted to a member-managed entity, then the November 13 Consent would have populated the Board of Managers with officers to whom the sole member had delegated his powers, not managers. Section 18-407 of the LLC Act provides that "a member or manager of a limited liability company has the power and authority to delegate to 1 or more other persons any or all of the member's or manager's . . . rights, powers and duties to manage and control the business and affairs of the limited liability company" and further provides that the delegation "shall not . . . cause the person

41

to whom any such rights, powers and duties have been delegated to be a member or manager." 6 *Del. C.* § 18-407. In that event, the November 13 Consent only would have appointed Steven and Jeffrey as officers, not managers.

Titus did not lose his status as manager as a result of the Amended LLC Agreement. He remained a manager, as did Huemoeller and Scott.

## B.     The Argument Based on the November 13 Consent

Shifting from the Amended LLC Agreement to the November 13 Consent, the plaintiffs argue that the latter document removed Huemoeller and Scott by describing Titus in a recital as "the sole Member and sole Manager." *See* JX 43. They also argue that the November 13 Consent necessarily removed all the managers and replaced them with Titus, Steven, and Jeffrey simply by specifying that Titus, Steven, and Jeffrey constituted the Board of Managers.

The plaintiffs' first argument is another effort to elevate the recital in a document to the level of a substantive provision. It fails for the same reason as their arguments about the descriptive references in the Amended LLC Agreement.

The plaintiffs' second argument relies on a managerial bump-out theory. In effect, they contend that by appointing three members to a board with only three seats, Titus bumped out the incumbents and moved successors into their seats. Under this view, Titus remained in his seat only because he bumped out himself. *See* Dkt. 134 at 30 ("Titus formed a Board of Managers pursuant to the First Amended LLC Agreement, and appointed Jeffrey, Steve, and himself to the three available seats. Doing so accomplished a removal, even if the First Amended LLC Agreement did not.").

42

The managerial bump-out theory lacks any support in Delaware law. As this court has explained, "[a]n individual cannot be appointed to a board with no vacancies." *Oracle P'rs v. Biolase, Inc.*, 2014 WL 2120348, at \*15 (Del. Ch. May 21, 2014); *accord Rainbow Mountain, Inc. v. Begeman*, 2017 WL 1097143, at \*10 (Mar. 23, 2017); *Bossier*, 1986 WL 12785, at \*5. Without a vacancy, there is no room for an individual to be appointed.

The plaintiffs again invoke the relative informality of LLCs, this time relying on a decision that described as "colorable" the argument that a power of appointment in an LLC agreement implied a power of removal. *PPF Safeguard, LLC v. BCR Safeguard Hldg., LLC*, 2010 WL 2977392, at \*8 n.72 (Del. Ch. July 29, 2010) (Strine, V.C.). Learned commentators have argued against this inference:

> If the limited liability company agreement omits clear provisions regarding removal, it may be argued that a manager cannot be removed. This argument finds support in the plain language of the statute, which provides that, subject to a manager's right or power to resign, "a manager shall cease to be a manager as provided in a limited liability company agreement."

Symonds & O'Toole, *supra*, § 9.05[C], at 9-53 (footnote omitted) (quoting 6 *Del. C.* § 18-402). In this case, the analysis never reaches the question of whether such a power existed because Titus never tried to exercise it.

A stronger version of the plaintiffs' argument would posit that regardless of its application in other settings, a managerial bump-out theory should be recognized for LLCs where the sole member has complete power over the terms of the LLC agreement. Entities of this type, the argument would go, are often run informally by laypersons, and enforcing formalities such as the need to effectuate a removal before an appointment would interfere unnecessarily with effectuating the member's intent. The plaintiffs correctly argue that the

balance of the contemporaneous evidence and credible witness testimony supports a finding that Titus intended to establish a three-member Board of Managers consisting of Titus, Steven, and Jeffrey, thereby getting rid of Huemoeller and Scott.

Assuming there could be a case in which intent would overcome formality for the benefit of the lay member of a single-member LLC, this case is not it. Both sides relied on counsel. Arabia's counsel reviewed the November 7 Consent. Then Silverman and his associate drafted the Amended LLC Agreement and the November 13 Consent. In doing so, they tried to take advantage of a loophole that Arabia's lawyers had left open: their failure to have Titus amend the Original LLC Agreement in a manner that would limit his ability to change his mind. Had Arabia's lawyers been more thorough, they could have had Titus amend the Original LLC Agreement when he adopted the November 7 Consent. Having learned their lesson the hard way, they followed that course with the Final LLC Agreement. Silverman and his associate failed to draft the documents necessary to effectuate the changes that they sought to have Titus implement. Because there were lawyers on both sides, this is not a case where evidence of intent should override the documents themselves.

## III. CONCLUSION

The Amended LLC Agreement capped the Company at three managers, but it did not remove Huemoeller or Scott. The November 13 Consent did not remove Huemoeller or Scott. The November 13 Consent purported to appoint Steven and Jeffrey as managers, but it failed in that attempt because there were no vacant manager positions to be filled. Effective November 7, 2017, the Company's managers were Titus, Huemoeller, and Scott.

44

As a result, there is no basis to challenge the validity of the actions taken by the managers after that date based on claims that Steven and Jeffrey became managers and were never properly removed.

The parties will confer regarding next steps in the case. If there are other outstanding issues that the court needs to address before a final order can be entered, then the parties shall submit a joint letter within fourteen days that identifies them and proposes a path to bring this case to a conclusion at the trial level. Otherwise, the parties shall submit a form of order implementing the rulings in this decision.